## Commonwealth *vs.* Robert E. Goodreau.

Hampden. January 6, 2004. - August 12, 2004.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Practice, Criminal,* Plea, New trial, Psychiatric examination, Defendant's competency, Assistance of counsel.

A Superior Court judge did not abuse his discretion in denying, without first conducting an evidentiary hearing, a criminal defendant's motion for a new trial, where the motion and supporting materials did not raise a substantial issue as to the defendant's competence at the time of his plea of guilty to murder in the second degree [348-355].

Indictment found and returned in the Superior Court Department on June 10, 1991.

A plea of guilty was accepted by *Charles R. Alberti,* J., and a motion for a new trial, filed on October 31, 1997, was considered by *Thomas J. Curley, Jr.,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Jane Davidson Montori,* Assistant District Attorney, for the Commonwealth.

*Alan Jay Black* for the defendant.

Sosman, J. The issue on appeal is whether the motion judge abused his considerable discretion when, without first conducting an evidentiary hearing, he denied the defendant's motion for a new trial. The Appeals Court, opining that the affidavits submitted in support of the motion were sufficient to raise a serious issue with respect to the defendant's competence at the time of his guilty plea, held that the judge had abused his discretion in ruling on the motion without an evidentiary hearing. *Commonwealth* v. *Goodreau,* 58 Mass. App. Ct. 552, 558-559 (2003). We granted the Commonwealth's application for further appellate review, and we now affirm the order denying the defendant's motion.

1. *Background.* a. *Investigation of the defendant's competency prior to his change of plea.* On June 10, 1991, the defendant was indicted for murder in the first degree stemming from the May 19, 1991, shooting death of his girl friend's twenty-two year old son. During the afternoon of May 19, the defendant and the victim had been playing chess and drinking wine at the defendant's girl friend's apartment. The defendant's girl friend and the victim's young son were also present. When the defendant and the victim later engaged in a heated argument, the defendant's girl friend told the victim to leave. The defendant went into his bedroom, retrieved a rifle, and returned to the living room as the victim was on his way out of the apartment. The defendant fired two shots, one of which struck the victim through the chest. The victim died shortly thereafter.

In a statement given to the police on the night of the shooting, the defendant acknowledged that he had shot the victim, although he did not have a specific memory of firing the shots. He remembered playing chess with the victim, and had some memory of a possible confrontation. He then remembered hearing a shot. He explained that the gun was kept in the bedroom closet, but that he always kept it unloaded with the clip stored in a can on the bureau (from which it could be inferred that the defendant had loaded the gun before returning to the living room and firing it).[1] Over the course of his confession, the defendant expressed remorse for the shooting and a desire to kill himself. He told the police that he loved the victim and the victim's child; that he considered the victim as his own son and the victim's child as his own grandson; and that the child had been present during the shooting and had witnessed his father's death.

On June 4, 1991, the defendant was examined for competency and criminal responsibility pursuant to G. L. c. 123, § 15 (*a*). The examiner, Dr. Barry Nigrosh, found "no evidence of thought disorder or misapprehension of reality." The defendant's "associations were logical, and his train of thought was goal

---

[1] The defendant's girl friend, who had witnessed the entire incident, testified to the argument between the two men, the victim's preparation to leave, and the defendant's reappearance with the gun. She confirmed that the defendant was the one who had shot the victim.

directed." Despite his very limited education, the defendant displayed a fund of knowledge and analytical skills, leading Dr. Nigrosh to conclude that the defendant had "average or above average intellectual capacity." The defendant had memory problems with respect to earlier periods of his life when he had been drinking heavily, but there was no evidence of short-term memory deficit. The defendant voiced feelings of guilt and remorse, and stated (in various ways) that he wanted to kill himself.

When Dr. Nigrosh questioned the defendant about the charges and the trial process, the defendant reflected an awareness of the seriousness of the charge, and gave "good descriptions" of the participants in a trial and their respective roles. He also described accurately the process of entering a plea, and reflected an understanding of plea negotiations. However, when the subject of plea bargaining was raised, the defendant stated that he did not want "any deals" and again expressed a desire to kill himself. When Dr. Nigrosh questioned the defendant as to whether he would cooperate with his lawyer and how he would react if his lawyer attempted to get him a reduced sentence or an acquittal, the defendant indicated that he would be cooperative. At the same time, however, he reiterated a desire for his own death.

Dr. Nigrosh opined that the defendant was "in most respects capable of understanding the proceedings." However, he found "some evidence of self-defeating motivation and desire for punishment which could interfere with [the defendant's] participation in defense planning and might be considered irrational." Therefore, Dr. Nigrosh stated that he could not "offer an unqualified recommendation that the defendant be considered presently competent for trial."

On the issue of criminal responsibility, Dr. Nigrosh found "no gross evidence of major mental illness," but did note "a marked situational depression." Based on the defendant's history of alcohol abuse and memory loss, Dr. Nigrosh questioned whether the defendant had suffered organic brain damage, although he saw no "strong evidence of organic deterioration." He was doubtful that there was a valid insanity defense, noting that voluntary intoxication was the "primary factor" underlying

the incident. However, because he could not "absolutely rule out the possibility of an underlying organic condition," he could not render an opinion on the issue of the defendant's sanity "in an unqualified way." As a result, Dr. Nigrosh recommended that the defendant be committed for further evaluation pursuant to G. L. c. 123, § 15 (*b*).

On June 7, 1991, the defendant was admitted to Bridgewater State Hospital (Bridgewater) for a period of evaluation. On July 10, 1991, Dr. Wesley E. Profit rendered his report, concluding that the defendant was competent to stand trial. By that time, the defendant was suffering "mild depression," which Dr. Profit found "appropriate to his circumstances." There was no evidence of "major mental illness." Dr. Profit did reference the defendant's long history of alcohol abuse, noting that "[o]rganic sequelae to alcohol abuse have not been ruled out." However, the defendant was oriented, able to speak "logically and coherently throughout," with no evidence of "any tangential thinking, loose associations, or flight of ideas." The defendant articulated a clear understanding of the charge against him, the seriousness of a murder charge (including recognition that it carried a life sentence), his right to an attorney, the attorney's responsibility to defend him and represent his interests, the roles of the other trial participants (district attorney, judge, and jury), and the nature of the adversary process. He again exhibited an understanding of the plea negotiation process (that he might have an opportunity to "plead guilty to a lower charge and get a lower sentence"). He indicated that he intended to work with his attorney to prepare a defense. When questioned about his prior statements to Dr. Nigrosh to the effect that he might deliberately impair his own defense or kill himself, the defendant explained that he had been "very upset" at the time, and that it was his present intention to assist in his defense. He did indicate a hope, "out of respect for the family of the deceased," that the proceedings would not be prolonged, but said he would not "sabotage his defense or act in a self-defeating manner." As a result, Dr. Profit opined that the defendant was competent to stand trial. Although "showing some signs of depression," that depression did not "substantially interfere" with his ability to comprehend the legal proceedings

facing him, and there were no signs of "a mental disease or defect which would interfere with his ability to cooperate with his counsel in the preparation of a defense." Seeing no need for psychiatric hospitalization, Dr. Profit recommended that the defendant be returned to court for further proceedings.

Seven months later, on February 24, 1992, the Commonwealth and the defendant submitted a stipulation to an agreed change of plea, with the defendant agreeing to plead guilty to so much of the indictment as charged murder in the second degree. The judge conducted a full colloquy, during which the defendant responded clearly to all questions posed.[2] The defendant acknowledged that he was an alcoholic, but told the judge that he had not consumed any alcohol or drugs that day and that his mind was clear. He denied that he ever "had a problem with mental illness" or a problem with drugs. He exhibited an awareness of the charge, the penalty, and the rights he was waiving. After the prosecutor's recitation of the facts, the defendant made one correction to a minor mistake in that recitation (specifying that more time had elapsed between the end of the chess game and the shooting). He indicated that he had discussed the case with members of his family and with his attorney, that he was satisfied with his attorney's representation, and that he was entering his plea willingly, freely, and voluntarily. At the conclusion of the colloquy, the judge found that the defendant had the ability to communicate and understand English; that he was not then and never had been "subject to any mental illness"; that he was an alcoholic, but had had no alcohol that day; that he had no prior problem with drugs and had consumed no drugs that day; that he was "fully aware" of his rights; that he acknowledged having shot the victim, "correcting only the time differential" with respect to the incident; and that the defendant entered his plea willingly, freely, and voluntarily. The defendant was then sentenced to the mandatory life in prison.

b. *Motion for a new trial.* Five and one-half years later, on October 31, 1997, the defendant filed a motion to withdraw his guilty plea and for a new trial. The plea judge had since retired,

---

[2]The plea judge's questions included many that called for more than a simple "yes" or "no" answer.

and the motion was assigned to another judge. In support of the motion, the defendant (represented by new counsel) submitted his own affidavit, along with affidavits from his brother, his former counsel, his new counsel, and a psychiatrist, Dr. Virginia Merritt. The principal theory of the motion was that the defendant had not been competent at the time that he changed his plea, coupled with corollary claims that his plea was not voluntary (due to that alleged incompetence) and that trial counsel had rendered ineffective assistance (for having failed to investigate or raise issues surrounding that alleged incompetence).

Dr. Merritt's affidavit opined that "as best as can be determined from retrospective information . . . it is likely that [the defendant] was incompetent to stand trial at the time he made his plea." She based that opinion on three grounds: (1) that, contrary to the evaluation of Dr. Profit, the treating psychiatrist at Bridgewater considered the defendant "to have a mental illness (bipolar disorder or major depression)," for which he had been prescribed various medications; (2) that the possibility of an organic condition or brain damage, identified in Dr. Nigrosh's evaluation, had not been examined by way of further testing, which "would have been a reasonable thing to do" to establish competency; and (3) that the defendant remained suicidal throughout, and attempted suicide after his return from Bridgewater by overdosing on one of his medications, from which Dr. Merritt concluded that the defendant's "suicidal thinking was a strong influence on his work with his attorney and the way he handled his attorney's advice," thereby raising "serious doubts" as to his competency.

The defendant's own affidavit recited his long history of alcohol abuse, leading to blackouts and repeated treatment at detoxification facilities. He claimed that he had been drinking heavily on the day of the shooting and did not "remember what exactly" occurred. He claimed that, at some unspecified time prior to his change of plea, he had attempted suicide by storing up on one of his medications and then taking approximately seventy pills at once, which caused him to vomit. He said that he never told anyone about that suicide attempt because he expected to make another such attempt and he did not want

anyone at the jail to prevent him from taking his own life. He claimed that, because of this constant suicidal ideation, he was not able to discuss his case "rationally" with his lawyer, listen "calmly" to his lawyer's advice, or assist his attorney in preparing a defense. He had told his lawyer that he did not want to go to trial because he did not want his girl friend "to have to relive this tragedy."

The affidavit of the defendant's brother confirmed the defendant's history of alcoholism and blackouts. He claimed that, up through the change of plea, the defendant "was deeply depressed" and uncommunicative, speaking only about "suicide and ending his life," and that "suicidal ideations" had "impaired his ability to think clearly about these events or discuss them in a rational fashion with anyone." Again without reference to any time frame, the defendant's brother claimed that the defendant had told him about his suicide attempt in jail.

The affidavit from trial counsel opined that the defendant "was capable of establishing a strong manslaughter defense," and that counsel had explained this defense theory to the defendant "many times" and gone over with him the evidence that would support it. He had told the defendant "that this case presented a strong possibility of manslaughter with not a strong probability of conviction of murder in the first degree." However, "[t]he defendant did not wish to go to trial." Counsel was unaware of any suicidal ideation on the part of the defendant, and unaware of any suicide attempt.

Finally, the affidavit from new counsel repeated and summarized the information set forth in the other affidavits and in the record of prior proceedings. His affidavit also recounted conversations he had had with former counsel, referencing information not contained in former counsel's own affidavit. Specifically, he reported that former counsel told him that he had not reviewed the Bridgewater records or sought expert opinion or further evaluation with respect to possible neurological deficits or lack of competency; that he (former counsel) had advised the defendant "many times" not to plead guilty to murder in the second degree; and that he had found the defendant to be "very depressed" at the time he changed his plea, making it very "difficult" to communicate with him.

The newly assigned motion judge denied the motion, holding that there were "no substantial issues" that would warrant an evidentiary hearing.

2. *Discussion.* The sole issue before us is whether the judge abused his discretion in ruling on the motion for a new trial without holding an evidentiary hearing. See *Commonwealth* v. *Arriaga*, 438 Mass. 556, 570 (2003), and cases cited. To sustain an appellate claim that a judge committed an abuse of discretion, it must be demonstrated that "no conscientious judge, acting intelligently, could honestly have taken the view expressed by him." *Commonwealth* v. *Ira I.*, 439 Mass. 805, 809 (2003), quoting *Commonwealth* v. *Bys*, 370 Mass. 350, 361 (1976).

On a motion for a new trial, the judge may rule on the motion "on the basis of the facts alleged in the affidavits without further hearing if no substantial issue is raised by the motion or affidavits." Mass. R. Crim. P. 30 (c) (3), 378 Mass. 900 (1979). Assessment of whether the motion and supporting materials suffice to raise a "substantial issue" involves consideration of the seriousness of the issue itself and the adequacy of the showing that has been made with respect to that issue. See *Commonwealth* v. *Arriaga*, *supra* at 571, and cases cited; *Commonwealth* v. *Stewart*, 383 Mass. 253, 257-258 (1981). Here, there is no dispute that a defendant's lack of competence to plead guilty would, if substantiated, raise a serious issue. See *Commonwealth* v. *Conaghan*, 433 Mass. 105, 110 (2000); *Commonwealth* v. *Robbins*, 431 Mass. 442, 444-447 (2000). The dispute centers on whether the motion and affidavits made an adequate showing with respect to that alleged lack of competence.

A defendant's submissions in support of a motion for a new trial need not prove the factual premise of that motion, see *Commonwealth* v. *Licata*, 412 Mass. 654, 662 (1992), but they must contain sufficient credible information to "cast doubt on" the issue. *Commonwealth* v. *Britto*, 433 Mass. 596, 608 (2001). A judge may also consider whether holding a hearing will add anything to the information that has been presented in the motion and affidavits. See *Commonwealth* v. *DeVincent*, 421 Mass. 64, 68 (1995). If the theory of the motion, as presented by the papers, is not credible or not persuasive, holding an evidentiary

hearing to have the witnesses repeat the same evidence (and be subject to the prosecutor's cross-examination further highlighting the weaknesses in that evidence) will accomplish nothing.

The premise of the defendant's motion was that, due to mental illness and suicidal tendencies, he had been incompetent when he pleaded guilty to murder in the second degree. The sole support for that premise was the opinion stated in Dr. Merritt's affidavit that "as best as can be determined from retrospective information . . . it is likely that [the defendant] was incompetent to stand trial at the time he made his plea." Although not a conclusive opinion as to the defendant's lack of competence, her expert opinion would arguably cast doubt on the issue. However, the judge could also consider the bases set forth in the affidavit as ostensible support for Dr. Merritt's opinion, and could reasonably conclude that the opinion itself was not credibly supported.

With respect to the defendant's claimed mental illness, Dr. Merritt rendered no opinion suggesting that she had diagnosed the defendant as having any mental illness. Instead, she asserted that a treating psychiatrist at Bridgewater had diagnosed the defendant as suffering "bipolar disorder or major depression," and criticized Dr. Profit's competency evaluation for his ostensibly contrary conclusion that the defendant had no "major mental illness."[3] The Bridgewater records, however, contain no diagnosis of "bipolar disorder" or "major depression," and do not contradict Dr. Profit's opinion. A progress note dated June 11, 1991, includes the following: "Imp[ression]: bipolar II — probably long term hypomania w[ith] occasional depression. ? if current depression is situational vs. major depression — time will tell." Another progress note, dated June 25, 1991, references the doctor's meeting with the defendant that day, during which the doctor "[s]pent time discussing how comb[ination] of alc[ohol] + bipolar illness could have caused him to do something like this. Still forces it out of his mind because does

---

[3]Dr. Nigrosh's initial evaluation had also found no evidence of "major mental illness." Dr. Nigrosh's recommendation that the defendant be evaluated further was based solely on the defendant's expression of a desire to punish or kill himself, as that desire might prevent the defendant from cooperating with counsel to plan a defense.

not know how to accept himself." Neither entry represents a diagnosis of "major depression" — indeed, the June 11 entry expresses uncertainty as to whether the defendant's depression was "situational" as opposed to "major," suggesting that further observation of the defendant would resolve the question. Dr. Profit's conclusion, after an additional month of observation, that the defendant's depression was "mild" and "appropriate to his circumstances" is not inconsistent with or undermined by the June 11 progress note that questioned the nature of the defendant's depression. Nor does either progress note set forth a definitive diagnosis of bipolar disorder. The June 11 entry references an initial "imp[ression]," made within a few days of the defendant's admission to Bridgewater, not a final diagnosis. The June 25 entry references a conversation with the defendant, not a diagnosis, the apparent point of that conversation being to address the defendant's inability to "accept himself" in the aftermath of his crime. Discussion of possible conditions that "could" explain the defendant's actions (and thereby help the defendant "accept himself" despite his evident remorse for his crime) is not a diagnosis of any particular condition.[4]

Moreover, a defendant's competence is not governed by the presence or absence of any particular psychiatric diagnosis. Rather, the test is framed in terms of the defendant's functional abilities: "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him." *Commonwealth v. Russin*, 420 Mass. 309, 317 (1995), quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960).[5] Here, there was no dispute that the defendant met the second prong of that analysis, as he

[4]Dr. Merritt's affidavit also states that the defendant "was prescribed several different psychiatric medications for bipolar disorder and depression" during his stay. That the defendant suffered "depression" is undisputed, and it is therefore unremarkable that he was prescribed medications to address that condition. It is also apparent that bipolar disorder was also being considered during his stay at Bridgewater State Hospital, and it is equally unremarkable that his medications would also have addressed that possible condition.

[5]The standard for competence to plead guilty is equivalent to the standard for competence to stand trial. See *Commonwealth v. Russin*, 420 Mass. 309, 316-317 (1995), quoting *Commonwealth v. Blackstone*, 19 Mass. App. Ct. 209, 211 (1985); *Commonwealth v. Morrow*, 363 Mass. 601, 607 (1973).

had, from the outset, articulated a sound understanding of the proceedings. The only dispute centered on whether the defendant had been able to consult with his attorney with the requisite "reasonable degree of rational understanding." *Id.* The fact that a defendant suffers from or is being medicated for some form of mental illness does not, by itself, mean that he is unable to work with his attorney. See *Commonwealth* v. *Laurore*, 437 Mass. 65, 70-72, 77-80 (2002); *Commonwealth* v. *Robbins*, 431 Mass. 442, 448 (2000). Indeed, the very purpose of prescribing medications for a mentally ill patient would be to ameliorate the adverse effects of that mental illness. As such, Dr. Merritt's suspicion that the defendant may have had a mental illness for which he was being medicated does not cast doubt on the opinion of Dr. Profit (who examined the defendant at the time and was able to observe his condition while on that medication) that the defendant was capable of rational consultation with his attorney.

Dr. Merritt's opinion is also based on her assumption that, at some unspecified point in time prior to the change of plea, the defendant had attempted suicide. The judge could rationally conclude that the factual predicate for that assumption was not credible. It stems solely from the defendant's own statement to Dr. Merritt (repeated in the defendant's own affidavit, again without any time frame), which the judge could discredit as self-serving. See *Commonwealth* v. *Grant*, 426 Mass. 667, 673 (1998); *Commonwealth* v. *Lopez*, 426 Mass. 657, 663 (1998).[6] Moreover, assuming that the defendant attempted or contem-

---

[6]The defendant also submitted an affidavit from his brother, who reported that the defendant told him about his suicide attempt. The judge could properly ignore such hearsay evidence. See *Commonwealth* v. *Evans*, 439 Mass. 184, 203, cert. denied, 540 U.S. 923 & 973 (2003); *Commonwealth* v. *Colantoni*, 396 Mass. 672, 682 (1986); *Commonwealth* v. *Stewart*, 383 Mass. 253, 258 (1981). Moreover, the brother's claim that the defendant had told him about the suicide attempt is at odds with the defendant's own affidavit, which claims that he (the defendant) never told "anyone" about that attempt. The brother's affidavit also claims that the defendant constantly spoke about killing himself, and that these "suicidal ideations permeated every facet of [the defendant's] thinking at this time and strongly impaired his ability to think clearly about these events or discuss them in a rational way with anyone." The brother's qualifications for making an analysis of the defendant's mental condition are not set forth, and the brother's affidavit could also be discounted on the

plated suicide at some time prior to his plea, that does not cast doubt on the opinion that he was competent. "Even an entirely rational defendant would be depressed, and might be suicidal, during a murder trial where the proof against him is substantial, and where he is facing life imprisonment with no possibility of parole." *Commonwealth* v. *Laurore, supra* at 79 (fact that defendant became suicidal during trial did not require judge to hold formal competency hearing). "[A] suicide attempt alone does not always 'create[] a doubt concerning the defendant's competency.' " *Id.*, quoting *Commonwealth* v. *Lameire*, 50 Mass. App. Ct. 271, 277 (2000). See *Commonwealth* v. *Russin*, 420 Mass. 309, 316, 318 (1995) (defendant's claim that he had attempted suicide one day before pleading guilty did not compel judge to hold evidentiary hearing on new trial motion); *Commonwealth* v. *Lameire, supra* (claimed suicide attempt during trial did not preclude judge's finding of competence).

Dr. Merritt's final stated basis for her opinion was that there had been no further testing to determine whether the defendant had suffered any organic brain damage as a consequence of his years of alcohol abuse. Criticizing Dr. Profit for not conducting additional testing does not suggest that such testing would have demonstrated a lack of competency. Dr. Merritt herself did not conduct any such tests, and has no evidence that the defendant has any organic brain damage.[7] And, as with mental illness, the fact that a defendant has experienced some form of brain injury would not, by itself, mean that that defendant could no longer communicate rationally with his attorney. Given the intellectual capabilities that the defendant demonstrated during his stay at Bridgewater (and during his earlier interview with Dr. Nigrosh), Dr. Profit could reasonably render an opinion as to competency without further investigating the possibility that the defendant might be suffering some degree of organic impairment as a result of his long-standing alcoholism.

ground of bias. See *Commonwealth* v. *Thomas*, 399 Mass. 165, 167 (1987). It would also be implausible that the brother, ostensibly knowing that the defendant was actively seeking to take his own life, apparently told no one at the jail about it at the time. The judge had ample grounds on which to conclude that the brother's affidavit was not credible.

[7] Dr. Nigrosh's earlier evaluation found that there was no "strong evidence" of organic injury, but he could not "absolutely rule out the possibility" of such injury.

On the ultimate issue — the defendant's ability to communicate and work with his attorney — there is nothing credible in this record to suggest that there was any difficulty in the relationship between the defendant and his counsel. The affidavit of the attorney who represented the defendant throughout the original proceedings is conspicuously silent on that crucial point. The attorney's affidavit indicates that he thought the defendant had a "strong manslaughter defense" and "not a strong probability of conviction of murder in the first degree," and that he so advised the defendant and explained to him the evidence that would support that defense. Apparently nothing in the defendant's mental or emotional condition had prevented counsel from developing a defense, and nowhere does the attorney express any reservation as to whether the defendant understood his explanations of that defense or his assessment of the risks of trial. Also absent from the attorney's affidavit is any claim that the defendant pleaded guilty against his attorney's advice, and there is nothing inherently irrational about pleading guilty to murder in the second degree in light of the attorney's assessment that the probability of conviction of murder in the first degree was not "strong."[8] The defendant's expressed wish not to go to trial, and his expressed desire not to prolong the ordeal for the victim's family, are eminently rational — an expression of remorse, or of empathy for one's victims, is not a sign of incompetence. See *Commonwealth* v. *Robbins*, 431 Mass. 442, 449 n.8 (2000) (defendant's "desire to spare his family and the victim's family and children the details that would be disclosed during trial is a rational reason for his plea" to murder in the first degree).

In his own affidavit, appellate counsel attempted to cure the obvious lacunae in trial counsel's affidavit by reporting his own conversations with trial counsel. In those conversations, trial counsel told him that he (trial counsel) had advised the defendant not to accept the plea offer and that "communication was difficult" with the defendant. Hearsay contained in af-

---

[8]Based on the defendant's retrieving the gun from another room, his loading the gun, and his firing at the victim twice at close range, the Commonwealth would have sufficient evidence to support a conviction of murder in the first degree on a theory of deliberate premeditation. See *Commonwealth* v. *Farley*, 432 Mass. 153, 157-158 (2000), and cases cited.

fidavits may be ignored by the motion judge. See *Commonwealth* v. *Evans*, 439 Mass. 184, 203, cert. denied, 540 U.S. 923 & 973 (2003); *Commonwealth* v. *Colantoni*, 396 Mass. 672, 682 (1986); *Commonwealth* v. *Stewart*, 383 Mass. 253, 258 (1981). Moreover, where trial counsel submitted his own affidavit, trial counsel's failure to confirm either of these points speaks volumes. When weighing the adequacy of the materials submitted in support of a motion for a new trial, the judge may take into account the suspicious failure to provide pertinent information from an expected and available source. See *Commonwealth* v. *Thurston*, 53 Mass. App. Ct. 548, 553-554 (2002). If mental illness, suicidal ideation, organic brain damage, a desire for punishment, or any other condition had resulted in the defendant's having problems communicating or cooperating with his lawyer, his lawyer would be the obvious witness to present evidence concerning the difficulties encountered. Yet that is the precise evidence that is missing from this record, and the judge could rightly attach significance to that very telling omission.

Finally, although he was not the judge who took the plea, the motion judge had before him the transcript of the plea colloquy and could review what had transpired during that colloquy. Beyond the fact that the defendant gave responsive and coherent answers to the judge's questions, the transcript confirmed that the defendant was attentive enough to the proceedings to correct a minor discrepancy in the prosecutor's recitation of facts. At that hearing, defense counsel expressed no qualms about his client's competence, nor any reservations about the wisdom of his client's decision to plead to the lesser charge of murder in the second degree. The plea judge's questioning, and his ultimate findings, similarly reflect no concerns about the defendant's demeanor, appearance, or any other condition that might suggest a lack of competence.

Accordingly, a "conscientious judge, acting intelligently, could honestly have taken the view expressed" by the motion judge when he concluded that this motion did not raise a substantial issue with respect to the defendant's competence to plead guilty. *Commonwealth* v. *Ira I.*, 439 Mass. 805, 809 (2003), quoting *Commonwealth* v. *Bys*, 370 Mass. 350, 361

(1976). The issue is not whether we, or whether a different judge ruling on the motion, might have opted to hold an evidentiary hearing to explore any of these matters further. The issue is whether this judge abused his discretion when he concluded that the motion and supporting materials did not make an adequate showing that would cast doubt on Dr. Profit's earlier assessment of the defendant's competency.[9] We conclude that he did not abuse that discretion and affirm his denial of the defendant's motion for a new trial.

*So ordered.*

---

[9]The defendant's motion also made a claim of ineffective assistance of counsel, in large measure flowing from his claim that his attorney failed to address his lack of competency. There is also a conclusory allegation that counsel failed to investigate all available defenses, but no evidence to support that allegation. Indeed, the motion itself reflected defense counsel's belief that he *did* have valid theories of defense, with evidence to support them. We agree with the Appeals Court that, as to the claimed ineffective assistance of counsel, the motion for a new trial did not raise any substantial issue requiring an evidentiary hearing. *Commonwealth* v. *Goodreau,* 58 Mass. App. Ct. 552, 559-560 (2003).