## COMMONWEALTH *vs.* JOSE OMAR ORTIZ
### (and three companion cases).

No. 04-P-961.

Hampden. February 13, 2006. - September 14, 2006.

Present: PERRETTA, KAFKER, & GREEN, JJ.

*Homicide. Practice, Criminal,* Costs, New trial, Instructions to jury, Witness, Assistance of counsel. *Witness,* Unavailability. *Evidence,* Failure to produce witness.

A Superior Court judge did not abuse her discretion in denying a criminal defendant's motion (made in association with a motion for a new trial) for funds to hire an investigator to locate an alleged exculpatory witness, where the judge considered the expected testimony of the witness and correctly concluded that the witness's testimony would not create a substantial issue warranting a new trial. [353-354]

A Superior Court judge hearing a criminal defendant's motion for a new trial, which alleged that the prosecution, by misrepresenting that an eyewitness to the crimes was unavailable, deprived the defendant of a missing witness instruction, did not err in concluding that the defendant was not entitled to such an instruction, where the evidence failed to demonstrate that the prosecution either had superior knowledge of the witness's whereabouts or gave an untrue reason for not producing the witness [354-360]; moreover, the judge did not err in concluding that trial counsel had not rendered ineffective assistance in failing to call a certain witness [360-361] or in denying the defendant's request for an evidentiary hearing [361].

INDICTMENTS found and returned in the Superior Court Department on November 29, 1999.

The cases were tried before *Bertha D. Josephson,* J., and motions for a new trial and for other postconviction relief were considered by her.

*Chauncey B. Wood* for the defendant.

*Marcia B. Julian,* Assistant District Attorney, for the Commonwealth.

PERRETTA, J. On consolidated appeals from his convictions of murder in the second degree, G. L. c. 265, § 1, and related

crimes,[1] and from the denial of his motions for a new trial[2] and for funds for an investigator, the defendant argues that the Commonwealth misrepresented that an eyewitness to the crimes was unavailable, thereby depriving him of a missing witness instruction, and that trial counsel's failure to call an alleged exculpatory witness constituted ineffective assistance.[3] The defendant also argues that the judge abused her discretion by denying his postconviction motion for funds to locate the alleged exculpatory witness and his request for an evidentiary hearing on his motion for a new trial. Seeing no error in the judge's rulings, we affirm the judgments and the orders denying the defendant's motions.

1. *Background.* (a) *The Commonwealth's case.* It was the Commonwealth's theory of guilt that on October 25, 1999, the defendant shot and murdered Eddy Javier Reynoso because of a dispute between them concerning Grisela Gonzalez. In support of this theory, the Commonwealth offered the testimony of Gonzalez and that of various law enforcement personnel, who produced physical evidence and related the details of their investigation that led to the defendant's arrest and confession.[4] The Commonwealth also had the defendant's written confession read to the jury.

In his confession, the defendant described how Reynoso repeatedly embarrassed and humiliated him about a poem he had written to Gonzalez, and he detailed Reynoso's attempts to

---

[1]The defendant was also found guilty of unlawful possession of a firearm, G. L. c. 269, § 10(*a*); unlawful possession of ammunition without a firearms identification card, G. L. c. 269, § 10(*h*); and discharging a firearm within 500 feet of a dwelling, G. L. c. 269, § 12E. The sentences imposed on these convictions were ordered to be served concurrently with the sentence imposed on his conviction of murder in the second degree.

[2]The defendant filed a "motion for post-conviction relief," an "addendum to his motion for post-conviction relief," and a "second addendum to his motion for post-conviction relief." We refer to these filings collectively as the defendant's motion for a new trial.

[3]The defendant pressed these two arguments on his motion for a new trial.

[4]A judge other than the trial judge denied the defendant's motion to suppress his confession. In the defendant's affidavit in support of that motion, he stated that he did not understand English, that the police never advised him of his rights, and that he signed some papers he did not understand because the police told him he had no choice. The defendant does not challenge the denial of his suppression motion.

make him jealous with claims that he, Reynoso, had a relationship with Gonzalez. The defendant stated that on the night of Reynoso's murder he met his friend, Carlos Rodriguez; that they walked to Reynoso's apartment; that as he, the defendant, knocked on the door to Reynoso's apartment, Rodriguez stood off to the side; that when Reynoso opened his door and saw the defendant, Reynoso began to swear and close his door; and that he, the defendant, fired his gun three times and fled from the building with Rodriguez. The defendant further stated that after separating from Rodriguez, he hailed a taxicab, and when he saw some trees a short time later, he had the driver drop him off and he threw the gun into the woods.[5]

In addition to the above evidence, one of the Commonwealth's witnesses, State Trooper John S. Schrijn, testified that the day after Reynoso's murder, a man named Alex Rosa was shot and killed, and that the bullets recovered from both homicide investigations were shot from the same gun and were the same type.

(b) *The defendant's case.* The defendant claimed that one of the men convicted of the Rosa homicide, Kelvin Gutierrez, shot Reynoso with the same gun that he used to kill Rosa. In support of that claim, the defendant called three witnesses and entered into evidence a stipulation that Gutierrez and Jean Carlos Almodovar were convicted of the shooting death of Rosa. The first witness called by the defendant was John G. Murphy, the State trooper who served as the case officer for the Rosa homicide. Trooper Murphy testified that a .38 caliber bullet was recovered during Rosa's autopsy and that he later learned ballistic tests established that the same gun was used in both the Reynoso and Rosa homicides. He also told the jury that a search of Gutierrez's apartment produced a "speed loader with two .38 caliber class rounds."[6]

Trooper Murphy further testified that he searched for a taxicab driver who picked up a fare matching the details as to time and place provided by the defendant in his confession; that

---

[5]Other trial evidence indicated that the gun had never been found.

[6]As explained by Trooper Murphy, a "speed loader" is a cylindrical device "that holds usually six bullets, perhaps more," and allows them to be loaded into a revolver all at once.

he located a driver; and that when he showed the driver a photographic array, which included the defendant, Gutierrez, and Almodovar, the driver, expressing some uncertainty, selected Gutierrez's photograph.

On cross-examination, Trooper Murphy testified that in the course of his investigation, he found "no relationship or ties" between Gutierrez and Reynoso, or between Almodovar and Reynoso. Nor did he find any connection between the defendant and Rosa.

To rebut the notion that the defendant was unacquainted with Gutierrez, the Commonwealth presented the testimony of a correction officer assigned to the Ludlow house of correction. The correction officer testified that on October 29, 1999, he spoke with the newly arrested defendant who, speaking in English, requested that he be placed in a cell with his friend, Gutierrez. On cross-examination, the correction officer acknowledged that during the transport and intake process, new inmates are free to speak among themselves.

The defendant's second witness was Luis A. Garcia, a man who lived in an apartment across the hall from Reynoso. Garcia testified that when he heard loud knocking on Reynoso's door, he looked out the peep hole in his door, saw the back of a tall male with short "kinky" hair, who was wearing a black jacket, and, after hearing a man ask, "Are you Eddy?" and "Do you know Lisa or Lucy?" he returned to watching television. Garcia told the jury that he looked out the peep hole a second time, saw Reynoso in his doorway, then returned to watching television, and that less than three minutes later, he heard three gunshots. On cross-examination, Garcia again stated that he saw only one person standing in the hallway and added that if another person remained standing in the staircase or to the right of his peep hole, he would not have seen him.

The third witness called by the defendant was Thomas Neville, the taxicab driver located by Trooper Murphy. Neville testified that he was dispatched to pick up a fare that was a "no show" and, as he was leaving the area, he was flagged down by a man who said he was the person who had called earlier for a taxicab. Neville described his fare as an English-speaking Hispanic man in his twenties, dark in complexion, about five

feet, six inches, to five feet, eight inches, tall, and weighing 160 to 170 pounds. Neville indicated that the fare was small, about four dollars. He also identified the photograph of Gutierrez as the one he selected from the array presented by Trooper Murphy.

2. *Motion for funds for an investigator.* The day after Reynoso's murder, Wilbert Diaz gave a signed statement to the police. According to Diaz's statement, he lived in the apartment next to Reynoso and was friends with the defendant. Diaz's statement substantially tracked the trial testimony of Garcia, the neighbor who lived across the hall from Reynoso. See part 1(b), *supra.* That is, on the night of the murder, Diaz heard loud knocking on Reynoso's door and a voice coming from the hallway ask, "Are you Eddy?" and request that Reynoso step outside his apartment. Diaz related that after Reynoso refused to step into the hallway, he heard three rapid gunshots, which he believed to be louder than shots fired from a ".357 revolver." He next heard "people running down the stairs very fast and the door slam down stairs [*sic*]." Diaz then ran into his bathroom and called the police on his cellular telephone. He remained in the bathroom until he heard the police in the hallway.

Appellate counsel filed a motion for funds to hire an investigator to locate Diaz. See Mass.R.Crim.P. 30(c)(5), as appearing in 435 Mass. 1502 (2001). In his affidavit in support of that motion, appellate counsel stated that during his investigation of the case, he learned that Diaz saw a man confront Reynoso moments before he was shot, and that Diaz could have testified that the defendant was not the man who confronted Reynoso. Appellate counsel also explained that although he was aware of Diaz's last known address, date of birth, and Social Security number, he needed funds to hire an investigator to locate Diaz's present whereabouts.

"In making the decision to allow costs associated with a new trial motion, the judge should take into account the likelihood that the expenditure will result in the defendant's being able to present a meritorious ground for a new trial." Reporters' Notes to Mass.R.Crim.P. 30(c)(5), Mass. Ann. Laws, Rules of Criminal Procedure, at 1589 (LexisNexis 2005). Such a decision is a matter of judicial discretion. See Mass.R.Crim.P. 30(c)(5)

("court . . . may . . . exercise discretion to allow the defendant costs"). In the instant case, the judge denied the defendant's motion for funds to locate Diaz based on her conclusion that Diaz's testimony would not create a substantial issue warranting a new trial. The judge found that the defendant failed to make a prima facie showing that Diaz would provide exculpatory evidence and that there was no reason to believe that Diaz's testimony would likely have influenced the jury's conclusion.

On appeal, the defendant argues that because Diaz told the police that he knew the defendant, it can be inferred that Diaz would have testified that the voice of the intruder who banged on Reynoso's door was not that of the defendant. It is, however, equally inferable that Diaz, based upon his friendship with the defendant, chose not to tell the police that he recognized the voice as being that of the defendant. Moreover, it has not escaped our notice that while the defendant's trial counsel signed an affidavit in support of the defendant's motion for a new trial, in which the defendant claims, in part, that trial counsel was ineffective for failing to call Diaz as a witness, counsel's affidavit is silent as to the reasons for not presenting Diaz as a trial witness. See *Commonwealth* v. *Goodreau*, 442 Mass. 341, 354 (2004).

For the above discussed reasons and based upon the record before us, which indicates that the judge considered the expected testimony of the alleged exculpatory witness and applied the correct standard, we conclude that the judge did not abuse her discretion in denying the defendant's motion for funds to hire an investigator to locate Diaz.

3. *Motion for new trial.* A judge may grant a motion for a new trial "if it appears that justice may not have been done." Mass.R.Crim.P. 30(b), as appearing in 435 Mass. 1501 (2001). As stated in *Commonwealth* v. *Moore*, 408 Mass. 117, 125 (1990) (citations omitted): "A motion for new trial is addressed to the sound discretion of the judge, and the judge's disposition of the motion will not be reversed unless it is manifestly unjust, or unless the trial was infected with prejudicial constitutional error. Reversal for abuse of discretion is particularly rare where the judge acting on the motion was also the trial judge." See *Commonwealth* v. *Fanelli*, 412 Mass. 497, 504 (1992) (rule 30[b] standard to be applied "rigorously").

In applying this standard of review to the defendant's arguments, we are mindful of the fact that the judge who denied the defendant's motion for a new trial was also the trial judge who, as set out in her detailed and comprehensive decision accompanying her ruling on the defendant's motion, was well aware of the discretion she had in ruling upon the defendant's request for a new trial, as well as her right to draw upon her familiarity with and memory of the witnesses and the evidence at trial.

(a) *Missing witness instruction.* The defendant claims that immediately prior to trial the prosecutor misrepresented that Rodriguez (who had provided the police with a statement that he was with the defendant when the defendant shot Reynoso) was unavailable and his whereabouts unknown. He argues that but for the prosecutor's misrepresentation, he would have been entitled to a missing witness instruction. See *Commonwealth* v. *Figueroa*, 413 Mass. 193, 199 (1992), quoting from *Commonwealth* v. *Schatvet*, 23 Mass. App. Ct. 130, 134 (1986) ("Where a party has knowledge of a person who can be located and brought forward, who is friendly to, or at least not hostilely disposed toward, the party, and who can be expected to give testimony of distinct importance to the case, the party would naturally offer that person as a witness. If, then, without explanation, he does not do so, the jury may, if they think reasonable in the circumstances, infer that person, had he been called, would have given testimony unfavorable to the party"). See generally *Commonwealth* v. *Smith*, 49 Mass. App. Ct. 827, 829-830 (2000).

In support of his claim that the prosecutor misrepresented that Rodriguez was unavailable, the defendant points first to the prosecutor's statement to the judge immediately prior to trial that Rodriguez was "unavailable," his "whereabouts unknown." To show the prosecutor's statement to be untruthful, the defendant presented two affidavits, one from his trial attorney and the other from a disinterested attorney.

According to his trial attorney's affidavit, the prosecutor advised him on more than one occasion that Rodriguez was being detained in a juvenile detention facility in Puerto Rico, and about two weeks before one of the several scheduled trial dates,

the prosecutor advised him that she intended to send officers to Puerto Rico to take custody of Rodriguez to bring him to Massachusetts to testify against the defendant. The disinterested attorney represented in his affidavit that while engaged in "small talk" in the court house hallway before the defendant's trial was to start, a Springfield police detective told him that there was a dispute between the office of the district attorney and the Springfield police department about "which office was going to pay to send officers to Puerto Rico to secure the attendance of a witness at the [defendant's] trial" and that "each office was refusing to spend the money to send the officers to get the witness." This attorney also stated in his affidavit that he "had the impression, from what the detective said and how he said it, that the witness was an important one for the Commonwealth."

There was a competing affidavit from the prosecutor in which she described her efforts to secure Rodriguez's attendance at trial. She related that "[s]ometime prior to trial" she learned that Rodriguez's family sent him to Massachusetts so he would "not fall in with troubled youths in Puerto Rico," and that when he became an eyewitness to Reynoso's murder, his family brought him back to Puerto Rico where he got into "some kind of trouble" and was in the custody of juvenile authorities. The prosecutor enlisted the aid of a Spanish-speaking member of her office to contact law enforcement officials in Puerto Rico for assistance in locating Rodriguez and arranging for his presence at the defendant's trial. She also sent a letter to the authorities in Puerto Rico, a copy of which was attached to her affidavit, in which she explained the reasons for requesting their assistance. The prosecutor stated in her affidavit that law enforcement officials in Puerto Rico refused to assist her or to disclose any information about Rodriguez because he was a juvenile.

As also related by the prosecutor, she had no specific recall of advising trial counsel of the obstacles she had encountered in attempting to secure Rodriguez's presence at trial, but she believed she would have done so, and she noted that when she told the judge that Rodriguez was unavailable, defense counsel voiced "no comment, objection, or request for a continuance." The prosecutor represented in her affidavit that she had provided

the defendant's trial attorney with a copy of Rodriguez's statement. In addition, she outlined in her affidavit how Rodriguez's testimony would have helped the Commonwealth's case. She also expressed her opinion, as well as the reasons for it, that Rodriguez would have been a valuable prosecution witness and that his absence worked to the Commonwealth's detriment rather than benefit.

In rejecting the defendant's claim of prosecutorial misconduct, the judge disregarded the affidavit of the disinterested attorney in which he set out his hallway conversation with the police detective. As the judge succinctly stated, "the circumstances of a casual conversation while waiting in the courthouse hallway suggest that [the dispute over expenses for Rodriguez's return to Massachusetts] could be a mere rumor, without any adequate support." The judge found that "the record is simply devoid of evidence demonstrating that the Commonwealth[] intentionally misled the Court and the defense counsel," and she concluded that even had the defendant requested a missing witness instruction, "he could not have satisfied the foundational requirements for comment and instruction on a missing witness."

On appeal, the defendant asserts that the affidavits show that he satisfied all four considerations that are significant in determining whether a missing witness instruction should be given against a party, specifically: (1) whether the case against the party is so strong that the party would naturally be expected to call a favorable witness; (2) whether the purported evidence of the missing witness is important or collateral and cumulative; (3) whether the party has superior knowledge of the identity and whereabouts of the missing witness; and (4) whether the party has given a plausible reason for the nonproduction of the witness. See *Commonwealth* v. *Graves*, 35 Mass. App. Ct. 76, 82-84 (1993) (*Graves*). See also *Commonwealth* v. *Smith*, 49 Mass. App. Ct. at 830 (indicating that when defendant requests missing witness instruction, first consideration may be formulated as whether Commonwealth's case is not so strong as to render unimportant or insignificant potential witness testimony). We do not agree.

As to the first two considerations, the defendant argues that the Commonwealth's case was entirely dependent upon his

confession, which he claims is unreliable.[7] In support of this claim, the defendant points to the fact that he was interrogated at the police station for over seven hours; that his confession was not corroborated by an audiotape[8]; that he signed papers written in English, a language that he claimed he could neither read nor speak[9]; and that his confession made no sense in that it would mean he gave up the opportunity to act alone, instead choosing to shoot Reynoso in front of a witness. For these same reasons, the defendant argues that the Commonwealth would be expected to call Rodriguez as a witness, and Rodriguez's testimony would be important rather than collateral and cumulative.

Based on the prosecutor's affidavit in which she explained the importance of Rodriguez to the Commonwealth's case — that he would have corroborated the defendant's confession and

---

[7] In making this argument, the defendant does not claim error in any of the findings of fact made by the judge who denied his motion to suppress.

[8] Although the defendant does not argue on appeal, as he did in his motion for a new trial, that trial counsel was ineffective for failing to request a cautionary instruction regarding the defendant's unrecorded statement, we nonetheless note that there was no error in the judge's ruling on this issue. The hearing on the defendant's motion to suppress was held and that motion denied on May 18, 2001, the trial began on September 25, 2002, and the jury returned their verdicts on October 2, 2002. As correctly noted by the judge in her memorandum of decision on the defendant's motion, *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 447-449 (2004) (establishing prospective requirement that, on request, jury instruction be given concerning lack of recorded confession where defendant's confession, or statement that is product of "custodial interrogation" or "interrogation conducted in a place of detention," is admitted in evidence), was decided about three years after the defendant's trial and was, therefore, inapplicable. See *Commonwealth* v. *Dagley*, 442 Mass. 713, 721-722 (2004).

As to the defendant's suggestion that the failure to audiotape the defendant's confession undermines its reliability, we note that the judge acting on defendant's motion to suppress expressly found that "the defendant was not mistreated . . . , no promises were made to him, . . . he was not threatened or beaten or [in] any way pressured or coerced into making the statement."

[9] While the judge made no finding whether the defendant could speak or read English, the judge found that the defendant gave his statement in Spanish; that a detective translated it into English; that the entire statement was read in Spanish to the defendant; that, when asked if he wanted to make any changes to the statement, the defendant responded that it was correct and that he did not wish to make any changes; and that the defendant signed the statement voluntarily.

helped to establish that the defendant planned Reynoso's murder — we assume for purposes of decision that the defendant has satisfied the first two of the four considerations set out in *Graves, supra* at 82-83, that is, the Commonwealth would be expected to call Rodriguez to testify to important matters. See *Commonwealth* v. *Phinney*, 446 Mass. 155, 167 (2006) ("The existence of a confession does not automatically mean that the evidence against the defendant was overwhelming").

We next address the third consideration set out in *Graves, supra* at 83, that is, whether the prosecutor had superior knowledge of Rodriguez's whereabouts. According to trial counsel's affidavit, the prosecutor advised him on more than one occasion before trial that she learned that Rodriguez had returned to Puerto Rico, where he was being held in a juvenile detention center. As further related by trial counsel, about two weeks before one of the "several" scheduled trial dates, the prosecutor informed him that she intended to send officers to Puerto Rico to take custody of Rodriguez and return him to Massachusetts. Trial counsel's affidavit shows that he, as well as the prosecutor, knew prior to trial that Rodriguez was somewhere in Puerto Rico in the custody of juvenile authorities. In addition, as noted by the prosecutor in her affidavit and verified by the transcript, defense counsel remained silent when the prosecutor represented to the judge that Rodriguez's whereabouts were unknown. Thus, the defendant failed to show that the prosecutor had superior knowledge of Rodriguez's whereabouts.

To support his argument to the contrary, the defendant points to the prosecutor's affidavit as an indication that she was in contact with Rodriguez's family in Puerto Rico and, therefore, had the means to ascertain his whereabouts. The only statements in the prosecutor's affidavit concerning Rodriguez's presence in Puerto Rico are that "[s]ometime prior to trial" she learned that Rodriguez had returned to Puerto Rico to live with his family and then got into trouble and was placed in the custody of the juvenile authorities. Not even the most generous reading of the prosecutor's affidavit supports the defendant's assertion that the prosecutor "was in contact with [Rodriguez's] family in Puerto Rico, who in turn must have known where [he] was being held."

Lastly, we address the fourth consideration set out in *Graves*, 35 Mass. App. Ct. at 83-84, that is, whether the prosecutor gave a plausible reason for not producing Rodriguez. As to this consideration, the defendant argues that the reason given by the prosecutor was untrue, and in support of this assertion, he refers to the disinterested attorney's affidavit narrating his hallway conversation with a Springfield police detective. In denying the defendant's motion for a new trial, the judge declined to give any persuasive force to this affidavit because it failed to contain information as to how the detective, identified by name, obtained the information related in the affidavit, that is, whether it came from a reliable source or rumor. We concur with the judge's assessment. Moreover, we cannot help but notice that, although the detective was named in the affidavit of the disinterested attorney, the record before us does not include an affidavit from the identified detective verifying this conversation, or an affidavit from appellate counsel that details his fruitless attempts to secure such an affidavit. See *Commonwealth* v. *Goodreau*, 442 Mass. at 353-354.

Based upon the above discussed considerations, we conclude that the judge did not err in determining that the defendant would not have been entitled to a missing witness instruction, even had he so requested, because of his inability to satisfy the requisite foundational requirements set out in *Graves*, *supra* at 82-84.

(b) *Ineffective assistance of trial counsel.* In accusing his trial counsel of ineffective assistance, the defendant points to counsel's failure to call Diaz (the neighbor who provided a signed statement to the police) as a witness. We think it unnecessary to set out the long-established standard of review applicable to this claim. See *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). See also *Commonwealth* v. *White*, 409 Mass. 266, 272-273 (1991) (tactics and strategy should be reviewed in deferential manner "to avoid characterizing as unreasonable a defense that was merely unsuccessful" and challenged tactical judgments must be shown as manifestly unreasonable).

In concluding that trial counsel was not ineffective by reason of his failure to call Diaz, the judge rejected the defendant's

contention that Diaz would testify, in effect, that the defendant did not shoot Reynoso. The judge found that any testimony from Diaz would merely corroborate Garcia's testimony and that the absence of Diaz's testimony did no "real harm to the overall defense" and "no real potential tactical disadvantage . . . could have arisen from the failure" to call Diaz. For the reasons set out in part 2, *supra*, we agree.

(c) *Request for an evidentiary hearing.* It is beyond dispute that in acting on a motion for a new trial the judge has the discretion to do so on the basis of the supporting affidavits and without an evidentiary hearing. In exercising that discretion, the judge is to look not only to the seriousness of the issues raised but also to the adequacy of the defendant's showing on those issues. See *Commonwealth* v. *Stewart*, 383 Mass. 253, 257-258 (1981). As stated in *Commonwealth* v. *Goodreau, supra* at 348-349: "If the theory of the motion, as presented by the papers, is not credible or not persuasive, holding an evidentiary hearing to have the witnesses repeat the same evidence . . . will accomplish nothing." In addition, the judge is free to ignore hearsay in an affidavit and to "take into account the suspicious failure to provide pertinent information from an expected and available source." *Id.* at 353-354. For the reasons set out in the judge's memorandum of decision and discussed in parts 3(a) and 3(b), *supra*, we conclude that the judge did not commit any error of law or otherwise abuse her discretion in denying the defendant's request for an evidentiary hearing on his motion for a new trial.

4. *Conclusion.* It follows from what we have said throughout this opinion that we conclude that the judge did not err in denying the defendant's motion for a new trial, request for an evidentiary hearing on that motion, or motion for funds for an investigator.

*Judgments affirmed.*

*Order denying motion for funds affirmed.*

*Order denying motion for new trial affirmed.*