NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-08921


COMMONWEALTH  vs.  DEMOND CHATMAN.


Suffolk.     December 11, 2015. - March 16, 2016.

Present:  Gants, C.J., Cordy, Botsford, Lenk, & Hines, JJ.


Homicide.  Practice, Criminal, New trial, Competency to stand
     trial, Capital case.  Evidence, Competency.  Due Process of
     Law, Competency to stand trial.



Indictment found and returned in the Superior Court
Department on June 5, 2000.

After review by this court, 466 Mass. 327 (2013), a motion
for a new trial was heard by Barbara J. Rouse, J.


Edward L. Hayden for the defendant.
Cailin M. Campbell, Assistant District Attorney (Mark T.
Lee, Assistant District Attorney, with her) for the
Commonwealth.


CORDY, J.  On February 10, 2000, police responded to a

telephone call made by the defendant, Demond Chatman, reporting

that his mother, the victim, had been shot.  The defendant

directed officers to the home of the victim's aunt, where the

defendant was living.  The police found the victim's body in the aunt's bedroom.

On January 24, 2002, a jury returned a guilty verdict against the defendant on the charge of murder in the first degree.  The defendant appealed, and, in May, 2008, during the pendency of that appeal, the defendant filed a motion for a new trial on the ground that he had not been competent to stand trial.  The motion judge, who was also the trial judge, denied the motion in October, 2011, after a nonevidentiary hearing.  The defendant appealed.

In September, 2013, we reversed the denial of the motion for a new trial and remanded the case for an evidentiary hearing consistent with a newly established burden of proof on defendants who, postverdict, seek a new trial on the basis of incompetency when the issue was not raised or considered at the time of, or prior to, trial.  See Commonwealth v. Chatman, 466 Mass. 327, 335-336, 339 (2013).  In November, 2014, after four days of evidentiary hearings, the motion judge again denied the defendant's motion.

Now before us for the second time, the defendant combines his direct appeal from his conviction with his challenge to the denial of his motion for a new trial.[1]  He also requests relief

_____

[1] The defendant's appeal, filed on December 10, 2014, was not timely, as it came more than thirty days after the November

pursuant to our authority under G. L. c. 278, § 33E. As we
explain below, our review of the entire record discloses no
basis on which to grant relief. We therefore affirm the
defendant's conviction and the denial of his motion for a new
trial.

1. Background. a. The trial. We summarize the essential
facts presented at trial, most of which are set forth in our
decision in Chatman, 466 Mass. at 328-330. The defendant had a
hostile relationship with his mother, the victim. On February
10, 2000, at 2:30 P.M., the defendant telephoned 911 to report
that his mother had been shot. Earlier that day, between 11
A.M. and noon, the defendant had told the aunt that he was going
to "work out" at Franklin Park. He also had asked her where she
kept the mop and bucket, which he wanted to use to clean his
room on his return.

The Commonwealth presented a circumstantial case against
the defendant at trial. A pathologist testified that, based on
the rigidity of the victim's body at the time it was found,
death occurred between 8:30 A.M. and 12:30 P.M. There was
evidence that the body had been moved to the aunt's bedroom,
where the police first viewed it, including deoxyribonucleic

_____

5, 2014, order denying the motion. See Mass. R. A. P. 4 (b), as
amended, 431 Mass. 1601 (2000). However, we will consider the
merits of the appeal pursuant to our authority under G. L.
c. 278, § 33E.

acid (DNA) testing that showed bloodstains belonging to the victim in the hallway, the bathroom, and the kitchen; in the defendant's bedroom, the defendant had left a bloody fingerprint. Further DNA testing indicated that blood found on the defendant's clothing and sneakers matched that of the victim. Bloody footprints were found in the bathroom, and the evidence indicated that washcloths had been used to soak up some of the blood.

The defendant sought to rebut the evidence offered by the Commonwealth, and unsuccessfully presented an alibi defense tending to show that he was at Franklin Park at the time of the victim's death.

b. The defendant's competency at trial. The issue of competency to stand trial was first raised six years after the trial in the defendant's May, 2008, motion for a new trial. Chatman, 466 Mass. at 327-328, 335-336.

At the evidentiary hearing in 2014, the defendant called ten witnesses in support of his position: Ray Walden, Dr. Mark Hanson,[2] and Patricia Hilliard,[3] who treated the defendant during

---

[2] In 1991, Dr. Mark Hanson diagnosed the defendant with a paranoid disorder. The disorder manifested itself in misperceived threats everywhere around the defendant, including among those people closest to him. Hanson reported that the defendant was pleasant and polite. Hanson did not offer an opinion as to the defendant's competency at the time of trial.

his early teens and into his high school years; trial counsel, John Bonistalli; Sharon Church, who was co-counsel at the trial; and Doctors Marion Smith, Joseph Grillo,[4] Charles Drebing, Robert H. Joss, and Naomi Leavitt, mental health professionals who were responsible for either treating or diagnosing the defendant after trial.[5]

Trial counsel Bonistalli testified that he began representing the defendant in 2000, and that he settled on an alibi defense based on his meetings with the defendant and his review of the police records. The defendant insisted that he did not commit the crime, so Bonistalli's reasonable doubt

---

[3] Starting in 1992 and lasting until 1999-2000, Patricia Hilliard met with the defendant most days after school as part of the Career and Life United in Boston. While the defendant never told Hilliard about his diagnosed mental illness, she perceived the mental health issues with which the defendant was afflicted. Hilliard described her relationship with the defendant as very warm. They communicated about his academic and career goals, in which she testified he was very much invested. Hilliard did not offer an opinion as to the defendant's competency at the time of trial.

[4] Dr. Joseph Grillo, a clinical psychologist, met with the defendant in February or March, 2002, while he was in prison. The defendant reported auditory hallucinations, depression, and anxiety. Dr. Grillo noted that the defendant was having trouble getting used to the fact that he might be in jail for the rest of his life. Dr. Grillo did not offer an opinion as to the defendant's competency at the time of trial.

[5] The parties stipulated as to the testimony of certain individuals associated with the defendant who offered views of his mental well-being. Having reviewed those stipulations, we conclude that the information universally does not pertain to the trial time period, and is therefore not relevant to our analysis.

defense relied on the defendant's statements and his assistance in reviewing the facts to establish an alibi. The defendant did not report any of his mental health history to Bonistalli, and Bonistalli did not notice anything to suggest that the defendant was impaired by some mental illness. Bonistalli testified that he had the impression that he was communicating with the defendant, and that the defendant understood what Bonistalli was talking about and was aware of the charges pending against him and the significance of the trial. Bonistalli did not recall any significant participation from the defendant during the trial itself.

Co-counsel Church's testimony related to about a two-week period, as she joined the defense team just a week before trial. Church testified that, in conversations with Bonistalli, the defendant insisted he did not commit the crime, but was instead at Franklin Park. The defendant also went on "tangents." During trial, the defendant sat silently and listened. Church concluded that the defendant did not actively assist in the preparation of the case, but did not offer an opinion as to the defendant's competency to do so.[6]

---

[6] The motion judge concluded that Sharon Church's testimony was "of little value." The defendant argues this was an abuse of discretion. We discern no error, given Church's minimal involvement with the defendant.

Also admitted in evidence were reports written by licensed medical health counsellors Darren Sandler, who, on January 25 and 26, the two days following the defendant's conviction, interviewed the defendant at Massachusetts Correctional Institution (M.C.I.), Concord; and Carrie Holowecki, who evaluated the defendant at M.C.I., Souza-Baranowski on January 30. Sandler indicated that the defendant presented as "calm," "cooperative," and "euthymic," while Holowecki reported that, though "nervous," the defendant was "alert," "oriented," and "logical," and had "good eye contact." Sandler reported that the defendant had many legal questions regarding his appeal and was in "shock" over his life sentence, remarking that it was "unbelievable." Neither noted any concern over any mental health issues until February 13, 2002, when Holowecki, in her second evaluation of the defendant, recorded that the defendant was experiencing "some paranoia" but remained "alert," "oriented," and "cooperative."

Dr. Smith, a psychiatrist, testified that she evaluated the defendant on February 20, 2002. Smith eventually diagnosed the defendant with schizoaffective disorder, and she was concerned that the symptoms with which the defendant presented existed prior to his incarceration. Smith did not offer an opinion as to the defendant's competency at the time of trial.

The defendant hired Dr. Joss, a forensic psychologist, in connection with the motion for a new trial. Joss testified that he met with the defendant, in connection with his initial evaluation, on three occasions, in March and December, 2005, and February, 2006, and interviewed the defendant by telephone in January, 2006. He also reviewed records of the case dating back to the 1970s. Aside from the defendant, Joss conducted two other telephone interviews: first with Ray Walden, an independent clinical social worker who had diagnosed the defendant with paranoid personality disorder at the age of twelve or thirteen;[7] and second with Dr. Prudence Baxter, a forensic psychiatrist with whom Bonistalli had spoken briefly about the possibility of a criminal responsibility defense prior to trial.[8] In addition, Joss consulted with Dr. Drebing, who, at Joss's request, had conducted a neuropsychological evaluation of the defendant in 2005 and had diagnosed him with a "psychotic spectrum disorder, such as possibly a delusional disorder,

---

[7] Ray Walden testified that the diagnosed paranoia did not prevent him from communicating with the defendant. Walden did not offer an opinion as to the defendant's competency at the time of trial.

[8] John Bonistalli, after speaking with Baxter, concluded that such a defense was not tenable because, among other things, the defendant insisted he had not committed the crime.

schizoaffective disorder, or a psychosis not otherwise specifi[ed]."[9]

Dr. Joss, who had submitted an affidavit in 2008 based on the foregoing evidence, further testified that his opinion at the time of the affidavit and at the time of the hearing, was that the defendant "lacked competence to stand trial" at the time of trial and had problems "in his ability to rationally understand the proceedings and . . . [to] rationally . . . assist counsel." He also admitted that, in reaching this conclusion, he had not spoken to Bonistalli or Church. Joss eventually spoke to Bonistalli for fifteen minutes on the telephone on March 31, 2014, the day before testifying at the evidentiary hearing. Joss was the only mental health expert to offer an opinion regarding whether the defendant was competent at the relevant time.

The period between the May, 2008, filing of the motion for a new trial and October, 2011, when the motion judge first denied the motion without a hearing, is noteworthy in that the defendant was evaluated twice, pursuant to court orders, for competency to participate in the motion hearing. Dr. Leavitt testified that she conducted both evaluations, the first of

---

[9] Dr. Drebing also testified that the defendant's intelligence quotient (IQ) "falls in the low average to borderline retarded range." Drebing did not offer an opinion as to the defendant's competency at the time of trial.

which was prompted by and occurred after the defendant had an outburst in court. Both evaluations focused specifically on competency as to the motion (and not the trial) period. Leavitt, in her initial evaluation, which was conducted to determine whether the defendant was competent to recommence the proceedings on the first motion for a new trial, presented an equivocal opinion as to the defendant's competency: the defendant had an adequate understanding of the proceedings and ability to make reasoned decisions; however, his ability to work meaningfully with counsel was compromised due to his lack of focus and social impediments. Specifically, the defendant did not trust appellate counsel. Therefore, Leavitt concluded, the defendant was competent to participate in the motion hearing only so long as he did not have to testify or appear in court.

Because the first evaluation did not result in a firm opinion as to the defendant's competency, Leavitt conducted a second evaluation in December, 2010, after the defendant had begun taking medication. In that evaluation, Leavitt opined that the defendant was competent to participate in the motion hearing. The defendant's first motion for a new trial was denied, and we reversed for an evidentiary hearing. Chatman, 466 Mass. at 339.

In denying the defendant's motion for a new trial on remand, the judge discredited Dr. Joss's opinion at the

evidentiary hearing as having no factual underpinnings. Although the judge acknowledged that the defendant suffered from a mental illness, which she concluded "waxed and waned at various times throughout his life," she determined that "[a] defendant may have a mental illness or condition[ and] still be competent to stand trial."

The defendant claims it was an abuse of discretion to deny the motion for a new trial and to discredit Joss's testimony. We disagree.

2.  Discussion.  The only argument the defendant raises in this combined appeal from his conviction and from the denial of his motion for a new trial is that the motion for a new trial was wrongly denied.

"The trial judge . . . may grant a new trial at any time if it appears that justice may not have been done."  Mass. R. Crim. P. 30(b), as appearing in 435 Mass. 1501 (2001).  The burden rests on the moving party to prove the facts on which he or she relies in support of the motion.  See Chatman, 466 Mass. at 333. The judge may rely on her knowledge of the trial in reaching a conclusion regarding the motion for a new trial.  Commonwealth v. Grace, 370 Mass. 746, 752-753 (1976).

"When this court reviews a defendant's appeal from the denial of a motion for a new trial in conjunction with his direct appeal from an underlying conviction of murder . . ., we

review both under G. L. c. 278, § 33E" (citation omitted).
Commonwealth v. Jackson, 471 Mass. 262, 266 (2015).  That is to
say, "we review the denial of that motion to determine if the
judge committed an abuse of discretion or other error of law
and, if so, whether such error created a substantial likelihood
of a miscarriage of justice."  Chatman, 466 Mass. at 333.  An
abuse of discretion exists when the motion judge made "a clear
error of judgment in weighing the factors relevant to the
decision, . . . such that the decision falls outside the range
of reasonable alternatives" (citation and quotations omitted).
L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).  Our
review "extends special deference to the action of a motion
judge who was also the trial judge."  Commonwealth v. Waters,
410 Mass. 224, 231 (1991), quoting Commonwealth v. Grace, 397
Mass. 303, 307 (1986).

a.  Competency.  Under both the Fourteenth Amendment to the
United States Constitution and art. 12 of the Massachusetts
Declaration of Rights, "[i]t has long been accepted that a
person whose mental condition is such that he [or she] lacks the
capacity to understand the nature and object of the proceedings
against him [or her], to consult with counsel, and to assist in
preparing his [or her] defense may not be subjected to a trial"
(citation omitted).  Commonwealth v. Brown, 449 Mass. 747, 759
(2007).  See Medina v. California, 505 U.S. 437, 439 (1992) ("It

is well established that the Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial").

With the present case, we have our first opportunity to review a motion judge's interpretation of the Chatman test. Therein, we articulated a new framework appropriate for evaluating a defendant's competency postverdict where the issue had not been raised at trial. Chatman, supra at 335-336. Like the traditional competency test, the hallmark of a postverdict competency inquiry is the defendant's "functional abilities," Commonwealth v. Goodreau, 442 Mass. 341, 350 (2004), as opposed to "the presence or absence of any particular psychiatric diagnosis." Id. To determine if a criminal defendant is competent, we look to (1) whether the defendant has "sufficient present ability to consult with his [or her counsel] with a reasonable degree of rational understanding," and (2) whether he or she has "a rational as well as factual understanding of the proceedings" (citation omitted). Commonwealth v. Bynum Harris, 468 Mass. 429, 443 (2014).

The newly articulated test differs from the traditional competency proceeding not in substance but in burden of proof. If the issue is raised at trial, the Commonwealth would bear the burden of establishing competence by a preponderance of the evidence. See Commonwealth v. Hilton, 450 Mass. 173, 179

(2007). The postverdict test, on the other hand, requires that the defendant establish "by a preponderance of the evidence that the Commonwealth would not have prevailed had the issue been raised at trial," Chatman, 466 Mass. at 336, meaning that the defendant bears the burden of establishing that, had the issue been raised before or during trial, the Commonwealth could not have proved either the first or the second prong of the competency test. See id. See also Bynum Harris, supra at 443. The defendant, therefore, need not make a showing that he was incompetent; instead, the defendant may satisfy his or her burden by showing "that the weight of the evidence of competence and the weight of the evidence of incompetence are in equipoise." Chatman, supra at 336, n.7.

Because a postverdict motion requires a retrospective determination of the defendant's competency, "the weighing process must necessarily place greater emphasis on evidence derived from knowledge contemporaneous with the trial." United States v. Makris, 535 F.2d 899, 907 (5th Cir. 1976), cert. denied, 430 U.S. 954 (1977). For that reason, when the postverdict motion is heard by the same judge as presided over the trial, the "judge's determination of competency is entitled to substantial deference 'because the judge had the opportunity to . . . evaluate the defendant personally.'" Brown, 449 Mass. at 759, quoting Commonwealth v. Prater, 420 Mass. 569, 574

(1995). The presence or absence of a mental illness is informative on the question of competency, but not dispositive. See Commonwealth v. Robbins, 431 Mass. 442, 448 (2000).

   i. Competency -- first prong. In determining whether the defendant had a present ability to consult with his lawyer with a degree of rational understanding, we look to whether the defendant has the capacity to communicate and cooperate effectively. See Commonwealth v. Crowley, 393 Mass. 393, 399 (1984). Specifically, we consider whether a "defendant's mental . . . condition . . . prevented counsel from developing a defense [and] . . . whether the defendant understood [counsel's] explanations of that defense or [counsel's] assessment of the risks of trial." Goodreau, 442 Mass. at 353.

   In addition to testimony at the evidentiary hearing, the record is replete with evidence regarding the undisputed proposition that the defendant has, since childhood, suffered from a mental illness. The testimony, affidavits, assessments, and evaluations paint a picture of an individual whose mental issues have affected his ability to socialize and acclimate to his community.

   However, while the defendant's mental illness undisputedly has existed since his youth, the symptoms he shows and his interactions with people have varied, or, as the motion judge put it, "waxed and waned." At times it is clear to those around

him that the defendant is suffering from a mental illness, while at other times he presents as calm, engaged, and communicative. Moreover, there is no evidence tending to equate the defendant's mental illness with an inability to communicate. In fact, the testimony indicates the opposite: doctors and mental health professionals alike have indicated that, whether or not the defendant was on medication at the time, and whether or not the defendant disclosed his history of mental illness, he was able to communicate and exhibited an understanding of his condition. In any event, competency and the defendant's ability to communicate and cooperate is a time period-specific inquiry, and our analysis must start with what little evidence we have about the defendant's mental state around the trial period.

We first consider the testimony of trial counsel, as it "may . . . provide relevant evidence as to the defendant's ability to understand the nature of the case against him and his ability to assist in the defense, as well as how the defendant helped shape the defense, if at all." Chatman, 466 Mass. at 339. Because of the time-determinative nature of our inquiry, trial counsel's testimony is critical in either substantiating or contradicting a postverdict competency challenge.

Bonistalli testified that he had met with the defendant on several occasions and had spoken with him about the police reports, about what occurred on the day when the defendant's

mother was killed, and about the factual pieces required to proffer an alibi defense.[10] He saw no indications that the defendant's condition resulted in an inability to communicate or cooperate with him as trial counsel.

The defendant presents Dr. Joss's testimony to establish that the defendant could not communicate with Bonistalli rationally. Joss pointed to several of the defendant's statements (made years after the trial period) to establish that the defendant did not trust Bonistalli. For instance, the defendant indicated he believed Bonistalli may have been working with the prosecutor, and therefore could not be trusted.

This testimony presents several problems. First, the only time-relevant statements tending to show that the defendant's paranoia caused him not to trust his trial attorney are those of the defendant. In the past, we have indicated that a motion judge is entitled, in the competency context, to discredit a

---

[10] During his testimony, it became apparent that Bonistalli's recollection of his representation of the defendant was exhausted as to several important issues. For instance, he did not recall whether he had spoken to the defendant about a possible criminal responsibility defense, or the extent to which they discussed the forensic evidence against the defendant. This reflects another problem with Dr. Joss's decision not to speak to Bonistalli until 2014; had he considered evidence of trial counsel's representation of the defendant when he began his evaluations, it is possible we would have had a more robust record as to the defendant's participation before and during trial.

defendant's own self-serving statements.  See Goodreau, 442 Mass. at 351.

Second, and more importantly, other parts of the record belie the defendant's assertions, and therefore Dr. Joss's testimony.  Dr. Leavitt included in her report that the defendant did not have trust issues with his trial attorney, and that his trial attorney gave him "the information straight up." Joss even noted in his evaluation the defendant's statement that "[he] trusted [Bonistalli] to do his job."

Third, the purported link between the defendant's illness and his inability to communicate with trial counsel is contradicted by the findings of mental health experts before and immediately after trial.  Both Walden and Hilliard, who met with the defendant in his youth, reported that the defendant's mental illness had not impeded their communication or the defendant's comprehension of their interactions.  Reports written by licensed medical health counselors at M.C.I., Concord and M.C.I., Souza-Baranowski days and weeks after the defendant's arrest indicated that the defendant was able to understood and discuss the ramifications of the guilty verdict against him.

Fourth, Bonistalli's testimony and the judge's viewing of the defendant's behavior at trial contradict the defendant's statements.  See Commonwealth v. DeMinico, 408 Mass. 230, 236 (1990), quoting Commonwealth v. Hill, 375 Mass. 50, 58 (1978)

("defendant's demeanor at trial and response to questioning by the judge . . . [are] relevant to a decision on the merits of the competency issue").  Because the trial judge never raised the issue of competency, we can infer that the defendant's behavior during trial was not so outside the ordinary as to raise a doubt about his competency.[11]

The defendant contends that a symptom of his mental illness was that the illness operated to conceal itself from Bonistalli at trial, which alone indicates a lack of competency.  That is, the argument goes, that it would have been irrational to conceal a history of mental health issues from counsel when facing charges of murder in the first degree; therefore, the defendant must not rationally have chosen to conceal his mental health history but instead did so because of his mental illness.

This argument finds no support in the record.  The defendant has, at various times, either disclosed his mental health history -- or chosen not to disclose it -- to multiple individuals, both those whom he purportedly trusted and those he had just met.  For instance, the defendant never told Hilliard about his prior mental health issues, but disclosed them to Dr.

---

[11] If there is a sufficient reason to doubt the defendant's competency, the judge must raise it sua sponte and hold a hearing.  See Commonwealth v. Hill, 375 Mass. 50, 54 (1978), quoting Commonwealth v. Vailes, 360 Mass. 522, 524 (1971).

Leavitt.[12] Bonistalli was never made aware of the defendant's diagnoses or treatment, but the defendant related them to appellate counsel. We therefore cannot infer from the record that the decision not to disclose a history of mental illness to his trial counsel was made due to a symptom of such illness as opposed to a rational decision by the defendant. Moreover, the fact that a defendant may not advance the most helpful defense does not necessarily equate with incompetence to stand trial. See Commonwealth v. Blackstone, 19 Mass. App. Ct. 209, 211 (1985) ("defendant's refusal to admit to his own mental illness and to employ it in his defense is not necessarily a manifestation of the mental illness itself. The world is full of people who do not own up to their limitations, often with remarkable success").

Even if the motion judge were to have credited Joss's testimony that the defendant had a mental illness that was in full effect during the trial period, this alone would not be sufficient to persuade us that the defendant has met his burden. One can both have a mental disease or deficiency and still be competent to stand trial; the two are not mutually exclusive. See Robbins, 431 Mass. at 448 ("The defendant's argument confuses the presence of mental illness with lack of competence

---

[12] The defendant also told Sandler, Holowecki, and Dr. Smith that he had been prescribed an antipsychotic medication as a child.

to stand trial"). The same is true about a defendant with a low intelligence quotient. See Prater, 420 Mass. at 574-575. We agree with the motion judge that the evidence tends to show that the defendant cooperated and communicated with his attorney, highlighted by the fact that, according to Bonistalli, testifying as to his contemporaneous interactions with the defendant, the defendant "insisted" that he did not kill the victim and that Bonistalli pursue an alibi defense. It was therefore not an abuse of discretion for the judge to conclude that the defendant did not meet his burden on the first prong of the competency test.

ii. Competency -- second prong. We are likewise unpersuaded by the defendant's assertion that he did not have a rational understanding of the proceedings against him. This second prong considers whether the defendant understood the crime of which he or she "was accused, who the important people [were] in the court room and what their roles [were], [and] what [the consequences would be] if he [or she] [was] found guilty." Bynum Harris, 468 Mass. at 443, quoting Vuthy Seng v. Commonwealth, 445 Mass. 536, 546 (2005), S.C., 456 Mass. 490 (2010). The defendant would not sufficiently understand the proceedings "if his mental condition preclude[d] him from perceiving accurately, interpreting, and/or responding appropriately to the world around him." Lafferty v. Cook, 949

F.2d 1546, 1551 (10th Cir. 1991).  The test is flexible enough to accommodate a defendant with a mental illness, as it "is satisfied upon a showing that the defendant possesse[d] at least a 'modicum' of rational understanding."  Doe, Sex Offender Registry Bd. No. 27914 v. Sex Offender Registry Bd., 81 Mass. App. Ct. 610, 613, n.4 (2012), quoting Blackstone, 19 Mass. App. Ct. at 211.

The only evidence tending to establish the defendant's level of understanding of the proceedings at trial, aside from Bonistalli's testimony, comes from Dr. Joss's interviews that occurred three and four years after the defendant's conviction. Joss put a great emphasis on the defendant's purported misunderstanding of the key players.  For instance, the defendant thought Bonistalli had a "cop look," and may therefore have been working with the prosecutor.  The defendant reported that he believed that Bonistalli, who is white, would have an advantage at trial over the prosecutor, who was Asian.  The defendant told Joss that the judge was always on the prosecutor's side, and that the judge "was making sad faces." The defendant also indicated that the prosecutor had used his peremptory strikes to take homosexuals and white women off the jury.

However, although purportedly concluding that the defendant's illness precluded his having a rational

understanding of the proceedings, Joss's testimony supports the opposite conclusion -- that, in fact, the defendant did have a rational understanding of the crime for which he was on trial, the important people involved in his prosecution and defense, as well as the consequences of a verdict against him. Joss admitted on cross-examination that the defendant could follow what was going on at the trial in 2002: he was aware that he was on trial for murder; understood his attorney to be working on his behalf; appreciated that the prosecutor was working against him; knew it was the judge's role to be fair; and recognized that the jury would reach the final verdict. And, looking back on the trial, the defendant knew that there had been witnesses who testified against him and that he had been found guilty. As to the comments about the ethnicities of Bonistalli and the prosecutor, Joss testified that such statements were "consistent with [the defendant's] history of racism," but not irrational. In sum, Joss's testimony regarding his findings presents a defendant who may have misconceived portions of the proceedings due to preexisting prejudicial stereotypes, but not one who could not rationally understand those proceedings.

Joss's testimony on cross-examination also undermined many of his findings. Dr. Joss either admitted that he had no basis to corroborate or substantiate many of the defendant's

purportedly irrational claims because he did not conduct independent research, or conceded that the statements could indeed have been rational. For instance, Joss's credibility as to the rationality of the defendant's statements is dubious in that he could not comment on the prosecution's use of peremptory strikes during jury selection because he had not spoken to anyone present; he was unable to determine whether there was any basis for the defendant's statement that Bonistalli had a "cop look" because Joss had only spoken to Bonistalli on the telephone and had never met him; and Joss admitted that he has, in the past, told defense attorneys that they should not speak to the prosecutor in front of the defendant if the defendant has shown signs of paranoia, indicating that it is not unusual for a defendant to worry about his attorney working with the prosecution. Taken together, these admissions indicate that the defendant did indeed have some underlying misperceptions about people based on their appearances, but that those misconceptions alone were not enough to show that his rational understanding of the proceedings was compromised. It is more important in establishing a "modicum" of rational understanding that the defendant understands the role and function of the key players and court mechanisms than it is that he put aside any lingering bigotry.

We infer no support for Dr. Joss's opinion about the defendant's competency at the time of trial from Dr. Leavitt's first evaluation of the defendant for the motion for a new trial proceeding. We acknowledged in Chatman that Leavitt "made a diagnosis of long-standing mental illness virtually identical to that of Joss." Chatman, 466 Mass. at 339. However, we note a distinct difference between Leavitt's findings and those of Joss that affect our analysis of the defendant's competence at the time of trial: Leavitt was reviewing the defendant's competency for a motion for a new trial hearing, and her findings were therefore related to appellate counsel, as opposed to trial counsel. In reaching her conclusion that the defendant could not contribute to his defense, Leavitt noted that the defendant had difficulties believing his appellate attorney. Leavitt also included in her evaluation that the defendant did not report any trust difficulties with his trial attorney, and that his trial attorney gave him "the information straight up." We cannot conclude from this evaluation that the defendant's issues with appellate counsel reflect similar problems during the course of trial with trial counsel, or whether any later mental issues could be due to the fact that, according to the defendant, his "world came to an end" when he was sentenced.

The defendant seems to argue that the Commonwealth's failure to proffer evidence at the motion for a new trial

indicates that its position is tenuous. To be clear, the Commonwealth bears no burden to establish that the defendant was competent at the time of trial, and may rest on impeachment of the defendant's arguments if it so chooses. However, should the Commonwealth eschew the opportunity to present argument or offer the opinion of an expert, it does so at its own peril.

We discern no error in the motion judge's conclusion that the defendant did not meet his burden, or in her decision to discredit Dr. Joss's opinion. As noted, Joss, prior to reaching his conclusion that the defendant was incompetent during the critical time period leading up to and encompassing trial, did not meet or consult with Bonistalli or Church. See Goodreau, 442 Mass. at 354 ("When weighing the adequacy of the materials submitted in support of a motion for a new trial, the judge may take into account the suspicious failure to provide pertinent information from an expected and available source"). It was not unreasonable for the motion judge to conclude that, while Joss is no doubt qualified to opine regarding the defendant's mental illness and about his competence at the time of his interviews, it was problematic that he reached the conclusion that the defendant was unable meaningfully to consult with his attorney or rationally to understand the proceedings at trial without speaking to the only people who could offer insight into that time period, aside from the defendant.

Because we agree that the defendant did not establish by a preponderance of the evidence that the Commonwealth would not have been able to meet its burden at a competency proceeding had the issue been raised prior to or at trial, we affirm the denial of the defendant's motion for a new trial.  As this was the only issue raised by the defendant in his appeal from his convictions and from the denial of his motion for a new trial, we will proceed to our G. L. c. 278, § 33E, review.

b.  Review under G. L. c. 278, § 33E.  We have conducted a thorough review of the record, in accordance with G. L. c. 278, § 33E, and have determined that no basis exists which would require us to remand the case, order a new trial, or to set aside or reduce the jury's verdict of murder in the first degree.  We therefore decline to exercise our authority.  The judgment and the order denying the motion for a new trial are affirmed.

So ordered.