NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13158


COMMONWEALTH  vs.  JOSEPH W. BEATTY.



Norfolk.     March 10, 2023. - May 25, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, & Wendlandt, JJ.



Homicide.  Criminal Responsibility.  Practice, Criminal, Capital
    case, Competency to stand trial, Instructions to jury.




Indictments found and returned in the Superior Court
Department on October 1, 2009.

The cases were tried before Thomas A. Connors, J.


Theodore F. Riordan (Deborah Bates Riordan also present)
for the defendant.
Pamela Alford, Assistant District Attorney, for the
Commonwealth.


WENDLANDT, J.  The defendant, Joseph W. Beatty, was

convicted of one count of murder in the first degree on the

theories of deliberate premeditation, extreme atrocity or

cruelty, and felony-murder in connection with the 2009 killing

of his girlfriend, Mary Beaton (victim), in her Quincy

apartment.[1]  The defendant admitted to killing the victim, whom he strangled and, later, asphyxiated with a pillow; however, he contended that, due to his mental condition at the time of the murder, he lacked criminal responsibility for her death.

On his direct appeal, the defendant maintains that the trial judge abused his discretion in finding the defendant competent to stand trial over defense counsel's objections, and that the jury instructions concerning the consequences of a verdict of not guilty due to lack of criminal responsibility, while conforming to the then-applicable model jury instructions, were prejudicial.  He also asks the court to exercise its authority under G. L. c. 278, § 33E, to reduce the degree of guilt or order a new trial.

Having carefully reviewed the defendant's claims of error, as well as the entire record, we affirm the conviction and discern no reason to grant relief under G. L. c. 278, § 33E.

1.  Background.  The following facts are supported by the evidence presented at trial.

a.  The Commonwealth's case.  On August 29, 2009, around 1:13 P.M., the defendant, his brother, two sisters, and niece entered the emergency room at Boston Medical Center.  The defendant was wearing a "raggedy" yellow T-shirt, which was

---

[1] He also was convicted of one count of aggravated rape in violation of G. L. c. 265, § 22 (a).

covered in blood. He had blood around his neck and wrist, and cuts to his wrist and hands.

At the hospital, the group approached uniformed Boston police Officer Daniel Quintiliani. The defendant's brother told Quintiliani that he needed to speak with the officer because the defendant "did a bad thing." Quintiliani asked the defendant what he had done. The defendant replied, "I strangled a girl in her apartment." The defendant provided Quintiliani with the victim's name and her address in Quincy. Upon request for identification, the defendant produced his own driver's license and an identification card in the victim's name. Quintiliani radioed dispatch to request a well-being check on the victim. The defendant appeared calm, and Quintiliani had no difficulty speaking with him. The defendant's brother removed a knife from the defendant's pocket and gave it to Quintiliani.

Thereafter, the defendant entered the hospital's triage unit. When a nurse asked him why he was there, the defendant answered that he had strangled his friend after an argument over finances. The defendant denied experiencing visual or auditory hallucinations and noted that he was a kidney transplant recipient. He also reported that he had experienced suicidal ideation.

Quintiliani's partner, Boston police Officer Daniel Korenetsky, who had arrived at the triage area, provided Miranda

warnings to the defendant;[2] the defendant indicated that he understood and proceeded to ask Korenetsky whether police had found the victim.  Korenetsky answered in the negative, to which the defendant replied, "[T]hey're going to have to kick the door in."  A short time later, Quintiliani learned that Quincy police had found the deceased victim's body in her apartment.

At 1:29 P.M., shortly after Korenetsky had provided the defendant with Miranda warnings, Boston police Detectives Joseph Leeman and Daniel MacDonald arrived at the triage area.  The detectives identified themselves and asked the defendant what had happened.  The defendant told them that, between 5 P.M. and 5:30 P.M. the prior day, he "just snapped" and choked his girlfriend at her apartment.  At that point, Leeman and MacDonald stopped the conversation, provided Miranda warnings to the defendant, and handcuffed him.  The defendant said that he understood his rights and wanted to speak to the officers; MacDonald left to get a tape recorder.  By 1:43 P.M., Boston police Detective Daniel Keeler arrived at the hospital; he also recited the Miranda warnings to the defendant.  Five minutes later, MacDonald returned from the police station with a tape recorder.

---

[2] When his brother offered to get the defendant a lawyer, the defendant replied, "What do I need a lawyer for, to get eighty years instead of a hundred years?"

The defendant told the officers that on the day of the killing, he went to the victim's apartment, where they drank a couple of beers, shared a valium pill, and argued about money. In particular, the victim was disappointed that they could not afford a trip to Las Vegas; she informed the defendant that she needed $500 for rent and proposed a less expensive trip to New York. At that point, the defendant "just snapped." He grabbed the victim's throat and began to strangle her; when she fell to the floor, the defendant "had sex" with the victim and carried her into the bedroom. The defendant saw white foam coming from the victim's lips, after which he covered her face with a pillow until she stopped breathing. The defendant placed a cross on the victim, placed crucifixes on both sides of her body, put her underwear on her, and covered her with a blanket. Before leaving the apartment, the defendant took knives to "take care of himself."

The defendant visibly was upset as he spoke; he added that "my brain was just doing what it was doing; I had no control over it." In response to a question by police that he had to be angry, the defendant stated: "[Y]eah, I know but I don't know what made me angry. . . . I've never had that anger in my life." After a psychiatric resident evaluated the defendant and determined that he did not require inpatient care, the defendant was released to police custody.

i. Defendant's activities before and after killing. A few days before the killing, between August 26 and August 28, 2009, the defendant was at Foxwoods Casino with one of his sisters, his niece, and four of his niece's children. On the morning of August 28, the last day of the trip and the day of the murder, the defendant, "distraught" and crying, told his sister that he had been molested as a child by a neighbor.[3] The family left the casino shortly thereafter. The defendant drove two of his niece's children in his van. His sister had no concerns about his driving.

Later that day, at around 8:30 P.M., approximately three hours after killing the victim, the defendant stopped at his niece's home to bring her a cup of coffee. His niece noticed that the defendant had a red mark on the side of his head. When she asked the defendant what had happened, he replied that he had slipped and fallen against his van.

The next morning, August 29, 2009, at around 8 A.M., the defendant called his niece and told her to tell the family that he loved them. Later that morning, the defendant called one of his sisters and told her that he was at their mother's favorite place, which his sister knew was a reference to Castle Island in

---

[3] The defendant later told police that he made this statement due to paranoia, flashbacks, suicidal thoughts, and other functional impairments he suffered because of surgery in June 2009 to remove most of his parathyroid glands.

the South Boston section of Boston. Fearing that the defendant intended to commit suicide, the defendant's two sisters and his niece drove to Castle Island but could not locate the defendant.

While searching, the group received a telephone call from the defendant. He agreed to meet his sisters and niece outside a restaurant in the South End section of Boston, across the street from Boston Medical Center. The three women arrived at the meeting place, where they were joined by the defendant's brother. Shortly thereafter, the defendant appeared. His sister testified that he looked "crazed," "disheveled," and "distraught"; his niece testified to seeing red marks on the defendant's neck and wrists.

On seeing his family, the defendant told them that he "did a bad thing," a phrase he repeated about twenty-five times. The group escorted the defendant across the street to the hospital, and, as discussed <u>supra</u>, they encountered Quintiliani.

ii. <u>Victim's apartment</u>. Quincy police responded to the victim's apartment shortly after 1 <u>P</u>.<u>M</u>. on August 29, 2009; the victim was found naked under a blanket on the bed, deceased.[4]

---

[4] At trial, first responders testified that they found the victim's body covered by a sheet, wearing an ornamental gold cross, and flanked by two crucifixes. These descriptions differed from the account provided by the defendant in the triage area in only one respect: the defendant told officers that he placed the victim's underwear on her before leaving, whereas the first responders testified that they found the victim in a state of total undress.

She had red scratches on her neck. Her soiled clothing lay on the floor near the bed.

The victim's underpants and vaginal and oral swabs contained sperm, and deoxyribonucleic acid (DNA) testing indicated that the defendant's DNA was consistent with the DNA mixtures from these samples. Additionally, a swab of the victim's neck produced a DNA mixture consistent with the defendant's DNA.

A medical examiner testified that the victim had petechial hemorrhages in her face, eyelids, and mouth; there were hemorrhages in her neck muscles, and her hyoid bone was broken. The examiner concluded that the cause of death was asphyxia by strangulation.

b. The defendant's case. The defense at trial was lack of criminal responsibility. Against the advice of counsel, the defendant testified regarding the events leading to and on the day of the murder.

The defendant testified that he had a kidney transplant in 2002 and surgery to remove most of his parathyroid glands in June 2009. Both before and after that surgery, he was forgetful, tired, confused, and doing "weird things," such as stealing a check from a neighbor so that he could visit a relative in California. On the day of the murder, while at Foxwoods Casino, the defendant heard voices in his head. The

voices made threats and commanded him to jump out a window at the casino.  He had no control over his "subconscious brain"; moreover, he was experiencing paranoia, such as believing that the driver of a pickup truck threatened to kill him for cashing stolen checks.

The defendant stated that his delusions and paranoia culminated at the victim's apartment, where, following an argument over finances, voices in his head prompted him, asking, "[W]hat are we going to do about her?"  In a state of "rage," he rushed the victim, strangled her to death, and dragged her body into the bedroom to have sex with her.  The defendant testified that he had no intention of killing the victim, but that his mind was "in outer space"[5] during the killing.[6]  The only times that he heard loud voices after his surgery was while at Foxwoods Casino and at the victim's apartment.

---

[5] The defendant added that he was "in a zone that [he had] never been in in [his] life before, in a zone [he did not] wish on anybody."

[6] The defendant's trial testimony conflicted with the account he gave officers at the hospital in several respects. For example, when provided with transcript pages where he previously stated that the victim proposed that they go to New York instead of Las Vegas, the defendant denied that she ever made that suggestion.  The defendant also denied that the victim requested $500 to pay rent.  When asked to explain these differences, the defendant claimed that his "subconscious brain" told him to say these things to police at the hospital.

Dr. Charles Carroll, a psychologist and the director of forensic services and psychology at Bridgewater State Hospital, testified for the defense.  Carroll had evaluated the defendant in November 2013 and opined that he had schizoaffective disorder.[7]  Carroll also noted that the defendant was prone to having delusions concerning his medical conditions, such as worrying that he was losing salt through his spine, causing dehydration, or that he was exposed to mercury and zinc fumes having lived above a television repair shop.  Carroll offered no opinion as to whether the defendant's mental disease made him unable to appreciate the criminality or wrongfulness of his conduct at the time of the murder.

c.  Rebuttal.  Dr. Michael Annuziata, a psychiatrist, testified for the Commonwealth.  He opined that the defendant had no significant psychiatric disorder, showed no signs of auditory hallucinations, and possessed adequate intellectual functioning.  Annuziata opined that the defendant had no mental

---

[7] "Schizoaffective disorder is a mental health disorder that is marked by a combination of schizophrenia symptoms, such as hallucinations or delusions, and mood disorder symptoms, such as depression or mania."  Schizoaffective Disorder, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/schizoaffective-disorder/symptoms-causes/syc-20354504 [https://perma.cc/2X8D-KP2E].  Carroll also testified that, when he first evaluated the defendant in 2010, he did not see any psychotic component to his diagnosis.

disease or defect at the time of the murder and, consequently, was able to recognize the wrongfulness of his conduct.

d. Procedural history. The defendant was indicted in October 2009 on one count of murder in the first degree in violation of G. L. c. 265, § 1, and one count of aggravated rape in violation of G. L. c. 265, § 22 (a). For approximately the next three years, the defendant would alternate between pretrial detention at a house of correction and commitment at Bridgewater State Hospital pursuant to G. L. c. 123, § 18 (a). In July 2010, the defendant, while awaiting trial, attempted to harm himself. He was sent to Bridgewater State Hospital for a thirty-day evaluation. At the conclusion of the evaluation, Carroll opined that the defendant had major depressive disorder with no psychotic component. Following an evidentiary hearing, held in February 2012, the defendant was found not competent to stand trial.

The defendant was evaluated at Bridgewater State Hospital for a second time in October 2013; Carroll diagnosed the defendant with schizoaffective disorder presenting in the form of psychotic delusions and paranoia. At a December 2013 hearing, a judge again found the defendant not competent.

On July 7, 2014, following a hearing, the judge found the defendant competent to stand trial. In September 2015, the judge committed the defendant to Bridgewater State Hospital,

pursuant to G. L. c. 123, § 18 (a), because he "require[d] hospitalization at [that] time . . . rather than await trial in a jail setting."  The judge agreed to a second commitment order pursuant to § 18 (a) on June 10, 2016, and a third on July 31, 2017.

On February 1, 2018, the judge again found the defendant competent to stand trial.  A jury trial commenced on February 27, 2019.  At several points during trial, defense counsel raised the possibility that the defendant was incompetent to stand trial.  Each time, the judge ordered a competency evaluation and determined that the defendant was competent.

On March 18, 2019, the jury found the defendant guilty on both counts.  As to the count of murder in the first degree, the jury found the defendant guilty on the theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder. The defendant was sentenced to life without parole and ordered to serve a concurrent sentence of from twenty-five to thirty years on the rape count.  The defendant filed a timely notice of appeal.

2.  Discussion.  On appeal, the defendant maintains that the judge abused his discretion in finding the defendant competent to stand trial over defense counsel's objections that he was unable to work with his client, that the judge should

have modified the jury instruction as to the consequences of a verdict of not guilty by reason of lack of criminal responsibility -- the so-called Mutina jury instruction[8] -- to comport with Commonwealth v. Chappell, 473 Mass. 191 (2015), and that we should exercise our authority under G. L. c. 278, § 33E, to reduce the defendant's convictions or grant a new trial. We address each argument in turn.

a. Determination of defendant's competency to stand trial. The defendant first contends that the judge abused his discretion in finding the defendant was competent to stand trial despite defense counsel's representations that the defendant was unable to communicate with counsel with the requisite degree of rational understanding and that he did not seem to understand the proceedings against him.

For a criminal defendant to be deemed competent to stand trial, a judge must find, at the time of trial, that the defendant (1) "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and (2) "has a rational as well as factual understanding of the proceedings against him." Commonwealth v. Russin, 420 Mass.

---

[8] As discussed in further detail infra, a Mutina instruction is a jury instruction setting forth the consequences of a verdict of not guilty by reason of lack of criminal responsibility. See Commonwealth v. Mutina, 366 Mass. 810, 823 & n.12 (1975).

309, 317 (1995), quoting Dusky v. United States, 362 U.S. 402, 402 (1960).  See Commonwealth v. Dias, 402 Mass. 645, 647-648 (1988) (same).  "The fact that a defendant suffers from . . . some form of mental illness does not, by itself, mean that he is unable to work with his attorney."  Commonwealth v. Goodreau, 442 Mass. 341, 351 (2004).

The Commonwealth bears the burden of proving the defendant's competency by a fair preponderance of the evidence. Commonwealth v. Prater, 420 Mass. 569, 573-574 (1995).  We review a trial judge's determination that a defendant is competent to stand trial for an abuse of discretion.  See Commonwealth v. Hung Tan Vo, 427 Mass. 464, 468-469 (1998).

In determining whether a defendant is competent, a judge may consider, inter alia, "the defendant's demeanor and behavior at the trial, reports of psychiatric examinations of the defendant, statements to the judge about the defendant's conduct and mental condition, and the testimony of expert witnesses at the trial about the defendant's conduct and condition." Commonwealth v. Hill, 375 Mass. 50, 54-55 (1978).  Weight must be given to a judge's own observations of a defendant's demeanor and behavior, with the observations made closest to or during trial being the "most appropriate" in determining competency. Commonwealth v. Jones, 479 Mass. 1, 14 (2018).

i.   Defense counsel's representations and judge's responses.  On the first day of trial, defense counsel raised several concerns regarding the defendant's competency; namely, that the defendant did not understand the difference between a jury trial and a plea, that he was too deferential to counsel's trial strategy, and that he held an unrealistic belief that trial would last a single day.  The judge ordered a competency evaluation.

After interviewing the defendant and reviewing prior competency records, a court forensic psychologist, Dr. Heather Jackson, indicated that the defendant accurately identified the parties and charges against him, possible dispositions, and described how he wanted to proceed.  The defendant also understood that trial would last longer than one day and was able to explain what the trial process would entail.  Jackson opined that the defendant was not "experiencing any significant deficits of his competency-related abilities within his factual or rational understanding" or exhibiting severe symptoms of mental illness; she did not recommend further evaluation.

Following Jackson's report, the judge made findings that the defendant met both the functional and cognitive prongs of the Dusky test:  "[The defendant] is able to have a rational understanding of what is occurring[,] and he is also able to identify the various participants in his trial process . . . and

is able to communicate with counsel."  See Dusky, 362 U.S. at 402.  As to defense counsel's representation that the defendant harbored an unrealistic view that trial would last one day, the judge credited Jackson's representation that the defendant no longer held that belief and that, contrary to defense counsel's earlier representation, the defendant was not agreeing "just for the sake of agreeing with her."  The judge noted defense counsel's objection and began empanelling the jury.

On the second day of trial, defense counsel raised further concerns; specifically, the defendant requested new counsel and claimed that the court room-provided water was affecting his medication.[9]  The judge tabled the matter and continued with jury empanelment.  By the end of the day, the defendant withdrew his request for new counsel, and following a discussion, the judge resolved the defendant's issue with his water by asking him to consult with the jail medical staff.  The judge also noted his observation that defense counsel had been interacting with his client during empanelment.  During this discussion, defense counsel raised two additional concerns:  first, that the defendant was fixating on medical records related to what counsel considered to be a nonviable defense; and second, that

---

[9] Jackson later confirmed that, while the defendant was not taking psychiatric medications, he was taking medication for his kidney transplant.

the defendant was insisting that there were "some outstanding phone records" that were in the possession of the Boston Red Sox.

To address counsel's ongoing concerns, the judge delayed the start of the third day of trial to allow Jackson to examine the defendant again.[10]  Following an hour-long evaluation, Jackson reported that the defendant continued to have a factual understanding of court proceedings, expressed a preference regarding how he wanted to proceed, and was not demonstrating serious deficits in his ability to rationally work with counsel. Moreover, Jackson noted that the defendant denied auditory hallucinations and was able to answer her questions clearly and coherently.  The defendant also was able to explain that the missing telephone records concerned a "flip" cell phone with a Red Sox sticker, not the baseball club.

Regarding the suicidal thoughts that the defendant had been experiencing that morning, Jackson noted that he lacked any immediate plans to harm himself.  Jackson was in contact with medical personnel at the house of correction, who were following the case and the stress it caused the defendant; she also learned that "two or three" of the defendant's prior G. L.

---

[10] As part of her second evaluation, Jackson reviewed Bridgewater State Hospital reports from 2010 to 2017, her notes from the previous evaluation, and contacted the house of correction where the defendant was then being held.

c. 123, § 18 (a), commitments stemmed from suicidal ideation, not psychotic symptoms.

Jackson opined that the defendant was competent to stand trial and did not recommend further evaluation. The following exchange ensued:

> Defense counsel: "Your honor, [the defendant] is suicidal, diagnosed with a serious mental illness. He's unmedicated for a couple of years now. He's not able to help me with his case."

> The judge: "I have no evidence of that, sir. You can't make argument that you -- injecting facts."

> . . .

> Defense counsel: "I'm asking the court as the factfinder to infer that given all of the circumstances that you gathered thus far, your Honor, that [the defendant is] not someone that I can work with."

The judge found that the defendant was competent to stand trial. The judge explained that, in finding the defendant competent, he was relying on the following: first, the court clinician twice found the defendant to be competent in the span of three days; second, the defendant indicated a readiness to work with his counsel; third, suicidal ideation is not tantamount to lack of competency; and fourth, some of the defendant's most recent G. L. c. 123, § 18 (a), commitments were attributable to

suicidal thoughts, not his diagnosed condition of schizoaffective disorder.[11]

At the end of the sixth day of trial, the judge noted that the defendant and defense counsel had conferred with each other as evidence was introduced.  On the morning of the seventh day of trial, the judge again observed that the defendant had been an active participant throughout trial.[12]  Later that day, during discussion of the sexual assault kit, defense counsel requested a sidebar and informed the judge that the defendant had ceased communicating with him, adding, "I don't think he's physically doing okay now."  The judge excused the jury for the day.  The parties discussed the defendant's mental state; the judge acknowledged that the defendant "had a somewhat different affect . . . than he ha[d] had through all of the earlier portions of the trial."

---

[11] See Commonwealth v. Laurore, 437 Mass. 65, 79 (2002) ("Even an entirely rational defendant would be depressed, and might be suicidal, during a murder trial where the proof against him is substantial, and where he is facing life imprisonment"); Commonwealth v. Lameire, 50 Mass. App. Ct. 271, 277 (2000) (claimed suicide attempt during trial did not preclude judge's finding of competency).

[12] The judge observed, "For the record, the court has observed throughout the trial that [the defendant] has interacted, that he has been alert, he has been watching the screen when exhibits have been up.  He has been interacting and speaking with counsel throughout the trial."

The judge requested the assistance of a court room clinician, and Dr. Leah Robertson joined the parties. Robertson examined the defendant. She reported that the past week, which featured significant video evidence of the victim and the crime scene, had been stressful for the defendant, that the defendant's thoughts had kept him awake the previous night, and that the defendant was tired, distracted, and having difficulty focusing. Without opining as to his competency, Robertson recommended that the defendant be sent to Bridgewater State Hospital for observation and treatment. The judge ordered the defendant committed pursuant to G. L. c. 123, § 18 (a).

Following a weekend break, the defendant returned to court on the next trial date, at which point the judge was given medical reports opining that the defendant was medically stable; defense counsel shared his observations of the defendant's difficulty focusing that morning. During a mid-morning break, the judge clarified that he had reviewed Carroll's 2015 report, a 2017 report from a court clinician, and prior counsel's motion to withdraw. The judge made findings:

> "The [c]ourt does not see any difference between what is occurring now and what's consistently been occurring all along, which is that [the defendant] has complained about voices which are characterize[d] sometimes as negative thoughts. They have not seemed to intrude at all, and, in fact, Dr. Carroll raised significant questions about whether or not they were legitimate. . . . [W]hile there was a period of incompetency some time ago, the recent[] [reports] have all come back that he's competent."

The trial continued. On the ninth day of trial, the judge observed that the defendant "was engaged with counsel several times, was conferring with counsel several times," and had taken notes when a witness testified. On the tenth day of trial, the defendant testified. At the conclusion of his testimony, the judge stated that the defendant responded normally to the questions asked; in addition, the judge noted that the defendant "has shown his functionality through this trial," and "[e]ven if his counsel may feel that [testifying] was not the most prudent choice that he had[,] that was his choice under the law."

At sentencing, the judge referenced his previous observations and stated that he had "no question" about the defendant's competency throughout the proceedings.

ii. _No abuse of discretion_. As set forth _supra_, the judge made multiple determinations regarding the defendant's competency over the course of the trial. In doing so, the judge considered the testimony of court clinicians, psychiatric evaluations, his own observations of the defendant's behavior, and statements from defense counsel about the defendant's "conduct and mental condition." _Hill_, 375 Mass. at 54-55. Significantly, the judge made these determinations during the trial, see _Jones_, 479 Mass. at 15 ("Because competency may be fluid . . . it is most significant that the defendant was found

competent in a hearing during the trial" [emphasis added]), with the benefit of contemporaneous psychiatric evaluations.

Contrary to the defendant's argument that the judge ignored defense counsel's concerns, as set forth supra, with every concern raised by counsel, the judge responded by seeking the assistance of medical experts, reviewing the defendant's mental health history, and sending the defendant to Bridgewater State Hospital for further evaluation when it became necessary. Additionally, the judge actively monitored the defendant's ability to communicate with and assist his lawyer,[13] scanning for manifestations of incompetency as the trial progressed.[14]  See Dusky, 362 U.S. at 408.  See also Commonwealth v. Chatman, 473 Mass. 840, 847-848 (2016).  The judge properly considered the

---

[13] For example, when the defendant indicated that he wanted to testify against the advice of counsel, the judge engaged him in a conversation about his knowledge of the right to testify in his defense.  The defendant responded, "Right.  [My lawyer] didn't tell me the laws about [testifying,] but he said that was my right if I wanted to or not to and he said it was best for me not to testify."

[14] Contrary to the defendant's argument, the judge did not base his findings solely on his own observations.  The record shows that the judge's comments regarding the observed working relationship between counsel and client was one data point, among many, used to evaluate competency.  In fact, the judge's comments postdated two separate evaluations of the defendant, conducted by the court room clinician.  See Commonwealth v. Companonio, 445 Mass. 39, 50 (2005), S.C., 472 Mass. 1004 (2015) ("The time frame for determining a defendant's competency to stand trial is the condition of the defendant at the time of trial" [citation and quotation omitted]).

expert opinions of Jackson and Robertson, the staff of
Bridgewater State Hospital, psychiatric reports dating back to
2014, and his own observations at trial, when considering
defense counsel's representations as to the defendant's
behavior.  See Commonwealth v. Gibson, 474 Mass. 726, 738 (2016)
(judge not required to credit defense counsel's unsupported
claim of incompetency); Commonwealth v. Vailes, 360 Mass. 522,
524 (1971) (judge entitled to rely on recent "psychiatric
report[s] as one of the elements bearing on the issue of the
defendant's competenc[y]").[15]

In sum, the judge did not abuse his discretion in finding
the defendant competent to stand trial.

b.  The Mutina instruction.  The defendant next argues that
the judge erred by instructing the jury on the consequences of a
verdict of lack of criminal responsibility as set forth in the
Model Jury Instructions on Homicide (2018).  The defendant
maintains that all references to commitment time should have

---

[15] The judge referenced the 2015 report by Carroll ("[I]n my
opinion, [the defendant] currently has a full factual and
rational understanding of the proceedings against him"), and the
2017 report by court clinician Dr. Frederick Kelso ("[I]n my
opinion [the defendant] is now competent to stand trial").  See
Vailes, 360 Mass. at 524.  Moreover, on the third day of trial,
the judge learned that several of the defendant's pretrial
hospitalizations were for suicidal ideation, not his
schizoaffective disorder.  See Goodreau, 442 Mass. at 351-352
(defendant's suicidal ideation prior to plea "does not cast
doubt on the opinion that he was competent").

been omitted from the instruction to avoid suggesting that the defendant could be released following a brief stay in a mental hospital.

A Mutina instruction is a jury instruction that outlines the consequences of a verdict of not guilty by reason of lack of criminal responsibility.  See Commonwealth v. Mutina, 366 Mass. 810, 823 & n.12 (1975).  Its function at the end of trial is

> "to avoid unnecessary speculation by the jury and ensure that they . . . understand 'what protection they and their fellow citizens will have if they conscientiously apply the law to the evidence and arrive at a verdict of not guilty by reason of [lack of criminal responsibility] -- a verdict which necessarily requires the chilling determination that the defendant is an insane killer not legally responsible for his acts.'"

Chappell, 473 Mass. at 206, quoting Mutina, 366 Mass. at 822.

Prior to this court's decision in Chappell, the Mutina instruction mentioned two time periods.  First, it explained that if a defendant were found not guilty by reason of a lack of criminal responsibility, the judge could order the defendant hospitalized at a facility for a period of forty days for observation and examination (observation period).  Second, the instruction noted that, if a defendant remained mentally ill and discharge would create a substantial likelihood of serious harm to the defendant or others, then the defendant could be committed to a mental health facility for six months (commitment

period).  See Model Jury Instructions on Homicide 11-12 (2013);
Commonwealth v. Waweru, 480 Mass. 173, 188 (2018).

The model Mutina instruction, as outlined supra,
"underestimate[d] the potential . . . length of confinement of a
defendant found not criminally responsible" in the minds of
jurors.  Chappell, 473 Mass. at 205.  See Commonwealth v.
Johnston, 467 Mass. 674, 701-702 (2014) (judge did not err in
refusing to provide defendant's proposed addition to model jury
instructions that "he could spend the rest of his life in a
locked facility").  Accordingly, the court in Chappell proposed
a provisional instruction that (1) omitted reference to the
observation period and (2) clarified that the commitment period,
subject to the court's review, could be indefinite:  "we think
an instruction that omits references to specific time frames for
observation and mentions the potential for successive commitment
orders that could span the duration of the defendant's life
. . . may better accomplish the[] purpose[]" of the Mutina
instruction.  Chappell, 473 Mass. at 206.  The 2018 revisions to
the model jury instructions reflect the Mutina instruction
proposed by the court in Chappell.  See Model Jury Instructions
on Homicide 11-12 (2018).

In the present case, the defendant asked the judge to omit
not only the observation period, but also the six-month

commitment period from his instructions.[16]  The defendant

contends that the rationale for omitting reference to the forty-

day observation period applies with equal force to the six-month

initial commitment period.  As set forth supra, however, the

court in Chappell considered two periods of confinement -- an

observation period and a commitment period; the court

recommended omission of the former, not the latter.  Chappell,

473 Mass. at 206.  We see no reason to modify that conclusion.

Here, the judge instructed the jury using language

virtually identical to the Mutina instruction from the 2018

Model Jury Instructions on Homicide:

> "If the court concludes that the defendant is mentally ill,
> and that his discharge would create a substantial
> likelihood of serious harm to himself or others, then the
> court will grant the petition and the defendant will be
> committed to a proper mental facility or Bridgewater State
> Hospital initially for a period of six months.  At the end
> of that six months, and every year thereafter, the court
> will review the order of commitment. . . .  There is no
> limit to the number of such renewed orders of commitment as
> long as the defendant continues to be mentally ill and
> dangerous.  If these conditions do continue, the defendant
> may remain committed for the duration of his life."

---

[16] The defendant proposed the following alterations to the
Mutina instruction set forth in the model instructions
(underlined text are additions, strikethroughs are deletions):

> "If the court concludes that the defendant is mentally ill
> and that his discharge would create a substantial
> likelihood of serious harm to himself or others, then the
> court will grant the petition and commit the defendant to a
> proper mental facility or to Bridgewater State Hospital.~
> initially for a period of six months. At the end of the six
> months and every year thereafter, the court The court will
> periodically reviews the order of commitment."

This was not error.[17]  See Commonwealth v. Bonner, 489 Mass. 268, 285 (2022), quoting Commonwealth v. Howard, 479 Mass. 52, 61 (2018) ("we have urged trial judges to adhere to the Model Jury Instructions on Homicide, and to 'proceed with caution' when not doing so"); Green, petitioner, 475 Mass. 624, 629 (2016) ("Instructions that convey the proper legal standard, particularly when tracking model jury instructions, are deemed correct").  See also Commonwealth v. Aduayi, 488 Mass. 658, 675-676 (2021) (judge did not err in giving pre-Chappell Mutina instruction where judge employed model jury instruction applicable at time of defendant's trial).[18]

c.  Review under G. L. c. 278, § 33E.  We recognize that the defendant presented substantial evidence that he lacked criminal responsibility at the time he killed the victim.

---

[17] Although the defendant sought to modify the Mutina instruction to address the concern that the jury might believe a long-term or lifetime commitment was precluded by a verdict of lack of criminal responsibility, the portion of the instruction stating expressly that the defendant could be committed for his lifetime was provided.  See Chappell, 473 Mass. at 205.

[18] The defendant's reliance on Aduayi is misplaced.  There, we affirmed a conviction of murder in the first degree although the trial judge included time frames of observation and commitment in his instruction on lack of criminal responsibility.  Aduayi, 488 Mass. at 673-674.  In doing so, we noted that the defendant's trial predated our decision in Chappell, and consequently, the defendant was not entitled to the benefit of the modified instruction, which was prospective only.  Id. at 675.

However, the Commonwealth presented substantial evidence to the contrary.  The jury were entitled to reject the testimony and opinions of the defendant and his expert and instead to credit the contrary evidence, including the opinion of the Commonwealth's expert.  In short, the jury were entitled to conclude that the defendant was criminally responsible.  See Johnston, 467 Mass. at 706 ("Tragic as this case is, it is a case where the question of criminal responsibility was truly for the jury, and justice does not require that their verdict be disturbed").  Based on our careful review of the entire record, we decline to reduce the degree of guilt, order a new trial, or grant other relief under G. L. c. 278, § 33E.

Judgments affirmed.